## EMPLOYEES OF THE DEPARTMENT OF PUBLIC HEALTH AND WELFARE OF MISSOURI ET AL. *v.* DEPARTMENT OF PUBLIC HEALTH AND WELFARE OF MISSOURI ET AL.

No. 71–1021.   Argued January 15, 1973—Decided April 18, 1973

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. MARSHALL, J., filed an opinion concurring in the result, in which STEWART, J., joined, *post,* p. 287. BRENNAN, J., filed a dissenting opinion, *post,* p. 298.

*A. L. Zwerdling* argued the cause for petitioners. With him on the brief were *Charles R. Oldham* and *George Kaufmann.*

*Charles A. Blackmar,* Assistant Attorney General of Missouri, argued the cause for respondents. With him on the brief was *John C. Danforth,* Attorney General.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Griswold* and *Richard F. Schubert.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The Eleventh Amendment, adopted in 1795, and formally ratified in 1798, provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

The Eleventh Amendment is the basis of a motion by Missouri to dismiss a complaint filed by employees of state agencies of that State, the Department of Public Health and Welfare, and two of its divisions, the Division of Mental Disease and the Division of Health, and various officials of the Department and of the two Divisions.

Although the Eleventh Amendment is not literally applicable since petitioners who brought suit are citizens of Missouri, it is established that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State. See *Hans* v. *Louisiana,* 134 U. S. 1; *Duhne* v. *New Jersey,* 251 U. S. 311; *Parden* v. *Terminal R. Co.,* 377 U. S. 184;[1] C. Jacobs, The Eleventh Amendment and Sovereign Immunity 109–110 (1972).

---

[1] The dissent argues that *"Parden* held that a federal court determination of such suits cannot be precluded by the doctrine of sovereign immunity because the States surrendered their sovereignty to that extent when they granted Congress the power to regulate commerce." *Post,* at 299. But, the plain language of the Court's

The employees seek overtime compensation due them under § 16 (b) of the Fair Labor Standards Act of 1938, 52 Stat. 1069, as amended, 29 U. S. C. § 216 (b), and an equal amount as liquidated damages and attorneys' fees. The District Court dismissed the complaint. The Court of Appeals, sitting in a panel of three, reversed, one judge dissenting. No. 20,204, Apr. 2, 1971 (not reported). On the filing of a petition for rehearing, the Court of Appeals sat *en banc* and by a closely divided vote set aside the panel decision and affirmed the judgment of the District Court. 452 F. 2d 820. The case is here on a petition for a writ of certiorari which we granted. 405 U. S. 1016.

The panel of three thought the present case was governed by *Parden* v. *Terminal R. Co., supra.* The court sitting *en banc* thought *Parden* was distinguishable. That is the central issue argued in the present case.

---

opinion in *Parden* belies this assertion. For example, the Court stated:

"Recognition of the congressional power to render a State suable under the FELA does not mean that the immunity doctrine, as embodied in the Eleventh Amendment with respect to citizens of other States and as extended to the State's own citizens by the *Hans* case, is here being overridden. It remains the law that a State may not be sued by an individual without its consent." 377 U. S. 184, 192. The Court then repeated that "[a] State's immunity from suit by an individual without its consent has been fully recognized by the Eleventh Amendment and by subsequent decisions of this Court." *Id.,* at 196. As we read these passages, and clearly as the dissent in *Parden* read them, *id.,* at 198, they dealt with constitutional constraints on the exercise of the federal judicial power. Moreover, if *Parden* was concerned merely with the surrender of common-law sovereign immunity when the States granted Congress the power to regulate commerce, it would seem unnecessary to reach the question of waiver or consent, for Congress could subject the States to suit by their own citizens whenever it was deemed necessary or appropriate to the regulation of commerce. No more would be required. But, there can be no doubt that the Court's holding in *Parden* was premised on the conclusion that Alabama, by operating the railroad, had consented to suit in the federal courts under FELA. *Id.,* at 186.

*Parden* involved a state-owned railroad operating in interstate commerce; and the claims were those of employees under the Federal Employers' Liability Act (FELA), 35 Stat. 65, as amended, 45 U. S. C. § 51 *et seq.* The term carrier for purposes of that Act was defined by Congress as including "[e]very common carrier by railroad while engaging in commerce between any of the several States." *Id.,* § 51. The Court concluded that Congress designed to bring state-owned, as well as privately owned, carriers within that definition and that it was empowered to do so by the Commerce Clause. The State's operation of its railroad in interstate commerce, it held, was in subordination to the power of Congress to regulate interstate commerce and application of the FELA to a State in those circumstances was not precluded by sovereign immunity. 377 U. S., at 191–193. The *Parden* case in final analysis turned on the question of waiver, a majority of the Court holding that it was a federal question since any consent of the State to suit did not arise from an act "wholly within its own sphere of authority" but in the area of commerce, which is subject to pervasive federal regulation. *Id.,* at 196.

It is said that the Fair Labor Standards Act (FLSA) stands on the same foundation, reflecting the power of Congress to regulate conditions of work of those producing goods for commerce, *United States* v. *Darby,* 312 U. S. 100, and those whose activities are necessary to the production of goods for commerce. *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 524. By § 3 (d) of the Act, "employer" was first defined to exclude the United States or any State or political subdivision of a State. But in 1966 there was added to § 3 (d) an "except" clause which reads "except with respect to employees of a State, or a political subdivision thereof, employed (1) in a hospital, institution, or school referred to in the last sentence of subsec-

tion (r) of this section . . . ." Section 3 (r) was amended at the same time to include: "the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, an elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit) . . . ." Identical language was also added in 1966 to subsection 3 (s), which defines "[e]nterprise engaged in commerce or in the production of goods for commerce."

By reason of the literal language of the present Act, Missouri and the departments joined as defendants are constitutionally covered by the Act, as the Court held in *Maryland* v. *Wirtz,* 392 U. S. 183. The question is whether Congress has brought the States to heel, in the sense of lifting their immunity from suit in a federal court—a question we reserved in *Maryland* v. *Wirtz, supra,* at 199–201.

There is no doubt that Congress desired to bring under the Act employees of hospitals and related institutions. S. Rep. No. 1487, 89th Cong., 2d Sess., 8, 22–23; H. R. Rep. No. 1366, 89th Cong., 2d Sess., 3, 11–12, 15, 16–17, 18. But § 16 (b) remained the same. Prior to 1966 and afterward, it read in relevant part:

> "Any employer who violates the provisions of section 6 or section 7 of this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction . . . ."

The history and tradition of the Eleventh Amendment indicate that by reason of that barrier a federal court is not competent to render judgment against a nonconsenting State. *Parden* involved the railroad business which Alabama operated "for profit." 377 U. S., at 185. *Parden* was in the area where private persons and corporations normally ran the enterprise.

State mental hospitals, state cancer hospitals, and training schools for delinquent girls which are not operated for profit are not proprietary. "Before 1810, only a few eastern-seaboard states had incorporated private institutions to care for the mentally ill, and Virginia alone had established a public asylum." D. Rothman, The Discovery of the Asylum 130 (1971).. But, as Rothman relates, after that the public sector took over.[2]

Where employees in state institutions not conducted for profit have such a relation to interstate commerce that national policy, of which Congress is the keeper, indicates that their status should be raised, Congress can act. And when Congress does act, it may place new or even enormous fiscal burdens on the States. Congress, acting responsibly, would not be presumed to take such

---

[2] "Few departures from colonial practices occurred in the first forty years after independence; the insane commonly languished in local jails and poorhouses or lived with family and friends. But in the course of the next few decades, in a dramatic transformation, state after state constructed asylums. Budding manufacturing centers like New York and Massachusetts erected institutions in the 1830's, and so did the agricultural states of Vermont and Ohio, Tennessee and Georgia. By 1850, almost every northeastern and midwestern legislature supported an asylum; by 1860, twenty-eight of the thirty-three states had public institutions for the insane. Although not all of the mentally ill found a place within a hospital, and a good number among the aged and chronic poor remained in almshouses and jails, the institutionalization of the insane became the standard procedure of the society during these years. A cult of asylum swept the country." *Ibid.*

action silently. The dramatic circumstances of the *Parden* case, which involved a rather isolated state activity can be put to one side. We deal here with problems that may well implicate elevator operators, janitors, charwomen, security guards, secretaries, and the like in every office building in a State's governmental hierarchy. Those who follow the teachings of *Kirschbaum* v. *Walling, supra,* and see its manifold applications will appreciate how pervasive such a new federal scheme of regulation would be.

But we have found not a word in the history of the 1966 amendments to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts. The *Parden* opinion did state that it would be "surprising" to learn that Congress made state railroads liable to employees under the FELA, yet provided "no means by which that liability may be enforced." 377 U. S., at 197. It would also be surprising in the present case to infer that Congress deprived Missouri of her constitutional immunity without changing the old § 16 (b) under which she could not be sued or indicating in some way by clear language that the constitutional immunity was swept away. It is not easy to infer that Congress in legislating pursuant to the Commerce Clause, which has grown to vast proportions in its applications, desired silently to deprive the States of an immunity they have long enjoyed under another part of the Constitution. Thus, we cannot conclude that Congress conditioned the operation of these facilities on the forfeiture of immunity from suit in a federal forum.

By holding that Congress did not lift the sovereign immunity of the States under the FLSA, we do not make the extension of coverage to state employees meaningless. Cf. *Parden* v. *Terminal R. Co., supra,* at 190. Section 16 (c) gives the Secretary of Labor authority to

bring suit for unpaid minimum wages or unpaid overtime compensation under the FLSA. Once the Secretary acts under § 16 (c), the right of any employee or employees to sue under § 16 (b) terminates. Section 17 gives the Secretary power to seek to enjoin violations of the Act and to obtain restitution in behalf of employees. Sections 16 and 17 suggest that since private enforcement of the Act was not a paramount objective, disallowance of suits by state employees and remitting them to relief through the Secretary of Labor may explain why Congress was silent as to waiver of sovereign immunity of the States. For suits by the United States against a State are not barred by the Constitution. See *United States* v. *Mississippi,* 380 U. S. 128, 140–141. In this connection, it is not amiss to note that § 16 (b) allows recovery by employees, not only of the amount of unpaid wages, but of an equal amount as liquidated damages and attorneys' fees. It is one thing, as in *Parden,* to make a state employee whole; it is quite another to let him recover double against a State. Recalcitrant private employers may be whipped into line in that manner. But we are reluctant to believe that Congress in pursuit of a harmonious federalism desired to treat the States so harshly. The policy of the Act so far as the States are concerned is wholly served by allowing the delicate federal-state relationship to be managed through the Secretary of Labor.

The Solicitor General, as *amicus curiae,* argues that *Hans* v. *Louisiana,* 134 U. S. 1, should not be construed to apply to the present case, his theory being that in *Hans* the suit was one to collect on coupons attaching to state bonds, while in the instant case the suit is a cause of action created by Congress and contained in § 16 (b) of the Act. It is true that, as the Court said in *Parden,* "the States surrendered a portion of their sovereignty when they granted Congress the power to regulate commerce." 377 U. S., at 191. But we decline to extend

*Parden* to cover every exercise by Congress of its commerce power, where the purpose of Congress to give force to the Supremacy Clause by lifting the sovereignty of the States and putting the States on the same footing as other employers is not clear.

We are told that the FLSA in 1971 covered 45.4 million employees and nearly 2 million establishments, and that 2.7 million of these employees and 118,000 of these establishments were in state or local government employment. We are also told that less than 4% of these establishments can be investigated by the Secretary of Labor each year. The argument is that if we deny this direct federal court remedy, we in effect are recognizing that there is a right without any remedy. Section 16 (b), however, authorizes employee suits in "any court of competent jurisdiction." Arguably, that permits suit in the Missouri courts but that is a question we need not reach. We are concerned only with the problem of this Act and the constitutional constraints on "the judicial power" of the United States.

*Affirmed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE STEWART joins, concurring in the result.

I believe that proper analysis of whether these employees may sue their state employer in federal court for overtime compensation owed to them under the Fair Labor Standards Act[1] requires consideration of what I view as two distinct questions: (1) did Congress, in extending the protection of the FLSA to state employees such as these petitioners, effectively lift the State's protective veil of sovereign immunity; and (2) even if Congress did lift the State's general immunity, is the exercise of federal judicial power barred in the context of this

---

[1] 29 U. S. C. §§ 201–219.

case in light of Art. III and the Eleventh Amendment? Portions of the Court's opinion convey the impression that these questions are but a single issue.[2] I do not agree.

Sovereign immunity is a common-law doctrine that long predates our Constitution and the Eleventh Amendment, although it has, of course, been carried forward in our jurisprudence.[3] While the present-day immunity of a State from suit by its own citizens or by citizens of another State in the absence of consent obviously cannot be justified on the common-law rationale that "the King can do no wrong," the principle has been said to be applicable to the States because of "[t]he inherent nature of sovereignty," *Great Northern Life Insurance Co.* v. *Read,* 322 U. S. 47, 51 (1944). See also *Kawananakoa* v. *Polyblank,* 205 U. S. 349, 353 (1907).

The common-law doctrine of sovereign immunity in its original form stood as an absolute bar to suit against a State by one of its citizens, absent consent. But that doctrine was modified *pro tanto* in 1788 to the extent that the States relinquished their sovereignty to the Federal Government. At the time our Union was formed, the States, for the good of the whole, gave certain powers to Congress, including power to regulate commerce, and by so doing, they simultaneously subjected to congressional control that portion of their pre-existing common-law sovereignty which conflicted with those supreme powers given over to Congress. This is one of the essential lessons of the decision in *Parden* v. *Terminal R. Co.,* 377 U. S. 184, 192 (1964), where the Court recognized that "[b]y empowering Congress to regulate com-

---

[2] See *ante,* at 285.

[3] See Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 2–21 (1963).

merce . . . the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." Congress having validly exercised its power under the Commerce Clause to extend the protection of th. . LSA to state employees such as petitioners, see *Maryland* v. *Wirtz,* 392 U. S. 183 (1968), the State may not defeat this suit by retreating behind its common-law shield of sovereign immunity.

Insofar as the Court may now be suggesting that the Congress has not effectively lifted the State's immunity from private suit in the context of the FLSA, I cannot agree. In the 1966 amendments, § 3 (d), 29 U. S. C. § 203 (d), which defines "employer" for the purposes of the FLSA was altered to cover expressly "employees of a State, or a political subdivision thereof, employed . . . in a hospital, institution, or school . . . ." [4] In the face of such clear language, I find it impossible to believe that Congress did not intend to extend the *full benefit* of the provisions of the FLSA to these state employees.[5] It is true—as the Court points out—that in 1966 Congress did not amend § 16 (b) of the Act, 29 U. S. C. § 216 (b), which provides for private suit by the "employee" against the "employer" to recover unpaid compensation. But this is readily explained by the fact that no amendment to the language of § 16 (b) was necessary to make the desired extension to state employees; the

---

[4] See also § 3 (r), 29 U. S. C. § 203 (r).

[5] See also S. Rep. No. 1487, 89th Cong., 2d Sess., 8 (1966), which described one of the purposes of the 1966 amendments as being "to make plain the intent to bring under the *coverage of the act* employees of hospitals and related institutions, schools for physically or mentally handicapped or gifted children, or institutions of higher education, whether or not any of these hospitals, schools, or institutions are *public or private* or operated for profit or not for profit." (Emphasis added.)

alteration of the definition of "employer" in § 3 (d) clearly sufficed to achieve Congress' purpose[6] and to express its will. Indeed, to suggest that § 16 (b) may not provide for suit by state employees, despite the alteration of § 3 (d) to include state employers, ignores the basic canon of statutory construction that different provisions of the same statute normally should be construed consistently with one another. See, *e. g., Clark v. Uebersee Finanz-Korporation, A. G.,* 332 U. S. 480, 488 (1947); *Markham v. Cabell,* 326 U. S. 404, 410–411 (1945); *Ex parte Public National Bank,* 278 U. S. 101, 104 (1928).

There remains, though, the question, where may these petitioners enforce against the State their congressionally created rights under the FLSA? Section 16 (b) authorizes employee suits "in any court of competent jurisdiction." Has Congress thus successfully compelled the State in this case to submit to employee suits in federal court?

The Eleventh Amendment provides:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

On its face the Amendment, of course, makes no mention of a citizen's attempt to sue his own State in federal court, the situation with which we deal here. Nevertheless, I believe it clear that the judicial power of the

---

[6] Section 16 (b), 29 U. S. C. § 216 (b), provides in relevant part: "Any employer who violates the provisions of . . . this Act shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."

United States does not extend to suits such as this, absent consent by the State to the exercise of such power. This question was first considered in *Hans* v. *Louisiana,* 134 U. S. 1 (1890), where a federal court action was brought against a State by one of its citizens who claimed that it had unconstitutionally repudiated certain debt obligations in violation of the Contract Clause of Art. I, § 10. Mr. Justice Bradley, speaking for the Court, observed that the suit was "an attempt to strain the Constitution and the law to a construction never imagined or dreamed of," and he then asked:

> "Can we suppose that, when the Eleventh Amendment was adopted, it was understood to be left open for citizens of a State to sue their own state in the federal courts, whilst the idea of suits by citizens of other states, or of foreign states, was indignantly repelled?" *Id.,* at 15.

The Court rejected such a suggestion in *Hans,* and it has continued to do so ever since. See *Duhne* v. *New Jersey,* 251 U. S. 311 (1920); *Fitts* v. *McGhee,* 172 U. S. 516, 524–525 (1899); *North Carolina* v. *Temple,* 134 U. S. 22 (1890).

The root of the constitutional impediment to the exercise of the federal judicial power in a case such as this is not the Eleventh Amendment but Art. III of our Constitution. Following the decision in *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), in which this Court held that federal jurisdiction encompassed a suit brought against a nonconsenting State by citizens of another State, the Eleventh Amendment was introduced to clarify the intent of the Framers concerning the reach of the federal judicial power. See, *e. g., Hans* v. *Louisiana,* 134 U. S., at 11–14. It had been widely understood prior to ratification of the Constitution that the provision in Art. III, § 2, concerning "Controversies .... between a State and Citizens

of another State" would not provide a mechanism for making States unwilling defendants in federal court.[7] The Court in *Chisholm,* however, considered the plain meaning of the constitutional provision to be controlling. The Eleventh Amendment served effectively to reverse the particular holding in *Chisholm,* and, more generally, to restore the original understanding, see, *e. g., Hans* v. *Louisiana, supra,* at 11–15. Thus, despite the narrowness of the language of the Amendment, its spirit has consistently guided this Court in interpreting the reach of the federal judicial power generally, and "it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given: not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification," *Ex parte New York, No. 1,* 256 U. S. 490, 497 (1921); see *Smith* v. *Reeves,* 178 U. S. 436, 447–449 (1900).[8]

---

[7] See The Federalist No. 81 (Hamilton); *Hans* v. *Louisiana,* 134 U. S. 1, 12–14 (1890); 1 C. Warren, The Supreme Court in United States History 91 (Rev. Ed. 1937); Cullison, Interpretation of the Eleventh Amendment, 5 Houston L. Rev. 1, 6–9 (1967).

[8] My Brother BRENNAN, in dissent, suggests that this case involves only a question of sovereign immunity and does not involve any question as to the limits of the federal judicial power under Art. III and the Eleventh Amendment. He considers this theory to be entirely consistent with the Court's seminal decision in *Hans* v. *Louisiana, supra.* As already indicated, there the private party attempted to sue his own State in federal court on the basis of the Contract Clause, not on the basis of a congressionally created cause of action. The Court concluded that the State was immune from such a suit in federal court, absent consent. Apparently, my Brother BRENNAN's view is that the result in *Hans* was due to the

This limitation upon the judicial power is, without question, a reflection of concern for the sovereignty of the States, but in a particularly limited context. The

fact that, unlike the present case, nothing had occurred to lift the State's common-law immunity. But such a reading seems to me at odds with his theory that at the time the Union was formed the States surrendered that portion of their sovereignty which conflicted with the supreme federal powers. For if the only relevant issue in *Hans* was the State's common-law immunity, such a view would seem to compel the conclusion that the States had also *pro tanto* surrendered their common-law immunity with respect to any claim under the Contract Clause. After all, the only difference between the Contract Clause and congressionally created causes of action is that the Contract Clause is self-enforcing, see, *e. g., Sturges* v. *Crowninshield,* 4 Wheat. 122, 197–200 (1819); it requires no congressional act to make its guarantee enforceable in a judicial suit. It seems to me a strange hierarchy that would provide a greater opportunity to enforce congressionally created rights than constitutionally guaranteed rights in federal court. Yet my Brother BRENNAN, given his theory of waiver of common-law immunity plus his theory that no constitutional limitation upon the exercise of the federal judicial power exists in the context of a suit brought against a State by one of its citizens, is forced either to this anomalous position or else to the admission that *Hans* was incorrectly decided. He apparently chooses the former.

However, if the issue of the limits of the judicial power, as well as of common-law immunity, is considered to be relevant in cases such as *Hans* and this case, the decision in *Hans* is sensibly understood as resting on the former basis alone. For, although the State's common-law immunity may have been no defense to a Contract Clause claim, the State had not consented to suit in federal court and therefore it was not susceptible to the exercise of the federal judicial power—regardless of the source of the federal claim. Thus, there seems to me little basis for doubting that *Hans* rested upon considerations as to constitutional limitations on the reach of the federal judicial power, a view confirmed by the decision's lengthy analysis of the constitutional debates surrounding Art. III, see 134 U. S., at 12–14, and by subsequent decisions of this Court, see, *e. g., Ex parte New York, No. 1,* 256 U. S. 490, 497 (1921); *Duhne* v. *New Jersey,* 251 U. S. 311, 313 (1920); *Georgia Railroad & Banking Co.* v. *Redwine,* 342 U. S. 299, 304 n. 13 (1952).

issue is not the general immunity of the States from private suit—a question of the common law—but merely the susceptibility of the States to suit before federal tribunals. Because of the problems of federalism inherent in making one sovereign appear against its will in the courts of the other, a restriction upon the exercise of the federal judicial power has long been considered to be appropriate in a case such as this.[9]

At the same time, it is well established that a State may consent to federal suit and submit to the exercise of federal jurisdiction over it.[10] See, e. g., *Petty* v. *Tennes-*

[9] Of course, suits brought in federal court against state officers allegedly acting unconstitutionally present a different question, see *Ex parte Young,* 209 U. S. 123 (1908). Likewise, suits brought in federal court by the United States against States are within the cognizance of the federal judicial power, for "[t]he submission to judicial solution of controversies arising between these two governments, 'each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other,' . . . but both subject to the supreme law of the land, does no violence to the inherent nature of sovereignty," *United States* v. *Texas,* 143 U. S. 621, 646 (1892). See also *United States* v. *North Carolina,* 136 U. S. 211 (1890). Moreover, it is unavoidable that in a suit between a State and the United States one sovereign will have to appear in the courts of the other.

[10] My Brother BRENNAN argues in his dissent that recognition of a State's power to consent to suit in federal court is inconsistent with any view that the impediment to private federal court suits against a State has constitutional roots in the limited nature of the federal judicial power. He is, of course, correct when he points out that, as a rule, power to hear an action cannot be conferred on a federal court by consent. And, it may be that the recognized power of States to consent to the exercise of federal judicial power over them is anomalous in light of present-day concepts of federal jurisdiction. Yet, if this is the case, it is an anomaly that is well established as a part of our constitutional jurisprudence. For there are decisions by this Court—including at least one joined by my Brother BRENNAN—clearly holding that constitutional limitations

*see-Missouri Bridge Comm'n,* 359 U. S. 275, 276 (1959);
*Gunter* v. *Atlantic Coast Line R. Co.,* 200 U. S. 273, 284
(1906); *Clark* v. *Barnard,* 108 U. S. 436, 447 (1883).
The issue, then, is whether the State has consented to
this suit by its employees under the FLSA.

In *Parden* v. *Terminal R. Co., supra,* this Court found
that Alabama which had undertaken the operation of an

----

upon the exercise of the federal judicial power over private suits
brought against a State may be waived by the State.

Thus, in *Clark* v. *Barnard,* 108 U. S. 436, 447 (1883), the Court
rejected Rhode Island's argument that a claim made against it in
federal court by a Connecticut corporation was specifically barred
by the Eleventh Amendment in light of the fact that initially the
State voluntarily intervened in the action to assert a claim of its
own and thereby consented. Similarly, in *Petty* v. *Tennessee-Mis-
souri Bridge Comm'n,* 359 U. S. 275 (1959), which involved a tort
suit brought in federal court by a resident of Tennessee (see 254 F.
2d 857, 862 (CA8 1958)) against a bi-state corporation formed by
Missouri and Tennessee, the Court treated the suit as one against
the States, but rejected their argument that the suit was prohibited
by the Eleventh Amendment. The Court found that the States
had waived their immunity from federal court suit in the compact
by which the bi-state corporation was formed. Given the citizen-
ship of the plaintiff in *Petty,* my Brother BRENNAN, with his liter-
alist view of the Eleventh Amendment, might say that as to Ten-
nessee there was no issue of constitutional magnitude and that the
State had simply waived its common-law immunity. But insofar
as Missouri was also held to have consented to federal court suit,
the Court necessarily dealt with the limits of the federal judicial
power since, as to Missouri, the suit was within the literal language
of the Eleventh Amendment. See also *Missouri* v. *Fiske,* 290 U. S.
18 (1933). In short, I cannot accept my Brother BRENNAN's liter-
alist approach to the Eleventh Amendment in light of prior de-
cisions, and certainly his position is not aided by the clearly erroneous
suggestion that any constitutional limitation on the exercise of the
federal judicial power over private suits against States would con-
stitute an absolute bar to the prosecution of such suits in federal
court.

interstate railroad had consented to suits brought in federal court by its railroad employees under the Federal Employers' Liability Act, 45 U. S. C. §§ 51–60. As to the State's suability in federal court, the Court reasoned that "Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act." 377 U. S., at 192. For me at least, the concept of implied consent or waiver relied upon in *Parden* approaches, on the facts of that case, the outer limit of the sort of voluntary choice which we generally associate with the concept of constitutional waiver. Cf. *D. H. Overmyer Co.* v. *Frick Co.*, 405 U. S. 174, 185–186 (1972); *Fay* v. *Noia*, 372 U. S. 391, 439 (1963); *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938). Certainly, the concept cannot be stretched sufficiently further to encompass this case. Here the State was fully engaged in the operation of the affected hospitals and schools at the time of the 1966 amendments. To suggest that the State had the choice of either ceasing operation of these vital public services or "consenting" to federal suit suffices, I believe, to demonstrate that the State had no true choice at all and thereby that the State did not voluntarily consent to the exercise of federal jurisdiction in this case. Cf. *Marchetti* v. *United States,* 390 U. S. 39, 51–52 (1968). In *Parden,* Alabama entered the interstate railroad business with at least legal notice of an operator's responsibilities and liability under the FELA to suit in federal court, and it could have chosen not to enter at all if it considered that liability too onerous or offensive. It obviously is a far different thing to say that a State must give up established facilities, services, and programs or else consent to federal suit. Thus, I conclude that the State has not voluntarily consented to

the exercise of federal judicial power over it in the context of this case.[11]

This is not to say, however, that petitioners are without a forum in which personally to seek redress against the State.[12] Section 16 (b)'s authorization for employee suits to be brought "in any court of competent jurisdiction" includes state as well as federal courts. See *Iowa Beef Packers, Inc.* v. *Thompson,* 405 U. S. 228 (1972). As I have already noted, Congress has the power to lift the State's common-law immunity from suit insofar as that immunity conflicts with the regulatory authority conferred upon it by the Commerce Clause. Congress has done so with respect to these state employees in its

---

[11] Whether I would reach a different conclusion with respect to a case of this character if the State had commenced operation of the relevant facilities after passage of the 1966 amendments is a question that I need not now decide. Certainly, I do not accept the Court's efforts to distinguish this case from *Parden* on the basis that there we dealt with a "proprietary" function, whereas here we deal with a "governmental" function. See *ante,* at 284–285. I had thought we had escaped such unenlightening characterizations of States' activities. Cf. *Maryland* v. *Wirtz,* 392 U. S. 183, 195 (1968); *United States* v. *California,* 297 U. S. 175, 183–184 (1936).

[12] Unlike the Court, I would not pretend to suggest that the power given the Secretary of Labor in § 17 of the FLSA, 29 U. S. C. § 217, to seek restitution on behalf of employees provides an adequate mechanism for safeguarding the interests of state employees such as petitioners. The United States, as *amicus curiae,* points out: "In 1971, . . . the [FLSA] covered 45.4 million employees and nearly 2 million establishments; 2.7 million of these employees and 118,000 of these establishments were in the sector of state and local government employment, including state schools and hospitals. Yet, less than 4 percent of these establishments can be investigated by the Secretary each year." Brief for United States as *Amicus Curiae* 22–23 (footnotes omitted).

It is obviously unrealistic to expect Government enforcement alone to be sufficient.

1966 amendments to the FLSA; by those amendments, Congress created in these employees a federal right to recover from the State compensation owing under the Act. While constitutional limitations upon the federal judicial power bar a federal court action by these employees to enforce their rights, the courts of the State nevertheless have an independent constitutional obligation to entertain employee actions to enforce those rights. See *Testa* v. *Katt,* 330 U. S. 386 (1947). See also *General Oil Co.* v. *Crain,* 209 U. S. 211 (1908). For Missouri has courts of general jurisdiction competent to hear suits of this character,[13] and the judges of those courts are co-equal partners with the members of the federal judiciary in the enforcement of federal law and the Federal Constitution, see *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 339–340 (1816). Thus, since federal law stands as the supreme law of the land, the State's courts are obliged to enforce it, even if it conflicts with state policy, see *Testa* v. *Katt, supra,* at 392–394; *Second Employers' Liability Cases,* 223 U. S. 1, 57–58 (1912).

I see our decision today, then, as nothing more than a regulation of the forum in which these petitioners may seek a remedy for asserted denial of their rights under the FLSA. At first blush, it may seem hypertechnical to say that these petitioners are entitled personally to enforce their federal rights against the State in a state forum rather than in a federal forum. If that be so, I think it is a hypertechnicality that has long been understood to be a part of the tension inherent in our system of federalism.

Mr. Justice Brennan, dissenting.

I dissent. *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964), compels reversal of the judgment of the Court of Appeals in this case and neither the Court's opinion

---

[13] See Mo. Rev. Stat. § 478.070 (2) (1959).

nor my Brother MARSHALL's opinion concurring in the result is persuasive that it does not.

## I

Essentially, the Court purports only to distinguish *Parden*. There is, of course, the distinction that the lawsuits were brought under different statutes. The lawsuit in *Parden* was brought under the Federal Employers' Liability Act (FELA), 45 U. S. C. §§ 51–60, against the State of Alabama, owner and operator of a railroad engaged in interstate commerce, by citizens of Alabama in the employ of the railroad. The suit in the present case was brought under § 16 (b) of the Fair Labor Standards Act (FLSA), 29 U. S. C. §§ 201–219, as amended in 1966, Pub. L. 89–601, 80 Stat. 830, against the State of Missouri, operator of hospitals and other institutions covered by that Act, by citizens of Missouri employed in such institutions. But the lawsuits have in common that each is an action for damages in federal court brought against a State by citizens of the State in its employ under the authority of a regulatory statute founded on the Commerce Clause. *Parden* held that a federal court determination of such suits cannot be precluded by the doctrine of sovereign immunity because the States surrendered their sovereignty to that extent when they granted Congress the power to regulate commerce. 377 U. S., at 191. That holding fits precisely this FLSA lawsuit and compels reversal of the judgment of the Court of Appeals. I turn, then, to the reasons for my disagreement with the arguments upon which the Court rests its contrary conclusion.

*Parden* presented a question of first impression, namely, whether a State's operation of a congressionally regulated enterprise in interstate commerce has the consequence, without more, that the State becomes subject to a congressionally imposed condition of amenability

to suit, or whether that consequence should follow only when Congress has expressly declared that any State which undertakes regulable conduct will be deemed thereby to have waived its immunity. *Parden* held that by operating the railroad, Alabama became amenable to suits under the FELA. *Parden* is distinguished on the ground that, whatever may have been the case of a suit under the FELA, in this suit under the FLSA the State may assert the defense of sovereign immunity unless Congress has foreclosed its assertion by clear language in the statute. But that very argument was rejected in *Parden* when advanced by the dissenters there as the principle that should control in all these cases. For the *Parden* dissent also argued that the immunity had not been surrendered when the States formed the Constitution and should be disallowed "[o]nly when Congress has clearly considered the problem and expressly declared that any State which undertakes given regulable conduct will be deemed thereby to have waived its immunity . . . ." 377 U. S., at 198–199. In rejecting that argument, *Parden* held that the States had surrendered the protection of sovereign immunity in federal court suits authorized by Congress pursuant to the States' grant to Congress of the commerce power. Thus, under *Parden,* there can exist no basis for today's inquiry "whether Congress has brought the States to heel, in the sense of lifting their immunity from suit in a federal court," *ante,* at 283, since *Parden* held that, because of its surrender, no immunity exists that can be the subject of a congressional declaration or a voluntary waiver. There can be room for such inquiry only upon acceptance of the rejected premise underlying the *Parden* dissent, namely, that the States in forming the Union did not surrender their immunity as such to that extent, but only subjected their immunity to congressional control.

The Court's rejection of that premise is explicit in *Parden*'s holding that:

"By adopting and ratifying the Commerce Clause, the States empowered Congress to create such a right of action against interstate railroads; by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit." 377 U. S., at 192.

In other words, the *Parden* holding, although perhaps not unambiguously phrased, was that when Congress conditions engagement in a regulated interstate enterprise upon amenability to suit, States that engage in such enterprise do not have the protection of sovereign immunity in suits in federal court arising from their engagement, because by surrendering their immunity to that extent when they granted Congress the commerce power, the States in effect agreed that Congress might subject them to suits in federal court arising out of their engagement in enterprises regulated by Congress in statutes such as the FELA and the FLSA.

However, even on the Court's premise that the grant to Congress of the commerce power did no more than empower Congress expressly to disallow the immunity, Congress must be taken to have disallowed it in § 16 (b) suits since Congress plainly stated its intention in enacting the 1966 amendments to put the States "on the same footing as other employers" in such suits. Since *Parden* had been decided two years before the amendments were adopted, Congress understandably had no reason expressly to declare the dis-

allowance since no immunity existed to be disallowed. But Congress' intention to make the States amenable to § 16 (b) suits clearly appears in the legislative history of the amendments.[1]   Indeed, this case is even more compelling than *Parden* on that score for the FELA contains no provision expressly including employees of public railroads under the Act but only a general provision making the FELA applicable to "every" common carrier by railroad in interstate commerce.   377 U. S., at 187–188.   In contrast, Congress directly addressed the question whether fully to extend the FLSA, including the provision of § 16 (b), to the public employees of the defined public institutions: the 1966 amendments thus enact a considered congressional decision to extend the benefits of the FLSA enjoyed by employees of private employers to employees of the States,

---

[1] That Congress made § 16 (b) as fully available to the public employees as to private employees is clear from explicit statements that the amendments were designed "to make plain the intent to bring under the coverage of the act employees of hospitals and related institutions, schools for physically or mentally handicapped or gifted children, or institutions of higher education, whether or not any of these hospitals, schools, or institutions are *public* or *private* or operated for profit or not for profit." S. Rep. No. 1487, 89th Cong., 2d Sess., 8 (1966) (emphasis added).   And it is stated on the same page:

"These enterprises which are *not proprietary,* that is, not operated for profit, are engaged in activities which are in substantial competition with similar activities carried on by enterprises organized for a business purpose. Failure to cover all activities of these enterprises will result in the failure to implement one of the basic purposes of the act, the elimination of conditions which 'constitute an unfair method of competition in commerce.'" (Emphasis added.)

Thus, I agree with the dissenting judges below that there is "in the circumstances surrounding this legislation a strong inference that Congress intended to afford state employees the same direct right of suit against their employers as is possessed by covered employees of nongovernmental employers." 452 F. 2d 820, 831 (1971) (Bright, J., dissenting).

or political subdivisions thereof, employed in the institutions covered by the amendments. I find no support whatever in either the text of the amendments or their legislative history for the arguments made by the Court for its contrary conclusion.

*First,* the Court observes that § 16 (b) was left undisturbed when the amendments were adopted. But § 16 (b) in terms applies to "[a]*ny* employer" covered by the Act. The extension of coverage to employers of public institutions made by the amendments was only the latest of several extensions made since § 16 (b) first appeared in the FLSA as initially adopted. Obviously, the words "[a]*ny* employer" blanket all FLSA employers and it is only the sheerest sort of ritualism to suggest that Congress excluded the States from § 16 (b) suits by not expressly referring to the States in § 16 (b).

*Second,* the Court argues that Alabama's operation of the railroad in *Parden* was "proprietary" in nature and Missouri's operation of hospitals and schools is "governmental" in character. That distinction does not, however, support the conclusion that Congress failed with sufficient clarity to subject States to § 16 (b) suits. *Maryland* v. *Wirtz,* 392 U. S. 183 (1968), which sustained the constitutionality of the 1966 amendments, construed the reach of the amendments as covering public enterprises having both characteristics, and expressly held "that the Federal Government, when acting within a delegated power, may override countervailing state interests whether these be described as 'governmental' or 'proprietary' in character." *Id.,* at 195. Indeed, the 1966 amendments themselves provide that the public enterprises, whether for profit or not for profit, "shall be deemed to be activities performed for a business purpose." 29 U. S. C. § 203 (r).[2]

---

[2] The Court of Appeals for the Tenth Circuit rejected the governmental-proprietary distinction on facts identical to those of the

*Third,* the Court argues that the amendments may saddle the States with "enormous fiscal burdens," and that "Congress, acting responsibly, would not be presumed to take such action silently." *Ante,* at 284, 285. Not only is the ancestry of the supposed presumption not divulged, but the Court offers no explanation how it overbears the clearly declared congressional purpose to subject States to § 16 (b) suits. Moreover, this argument tracks the rejected argument of the dissent in *Maryland* v. *Wirtz* that the 1966 amendments "overwhelm state fiscal policy" and therefore offend "constitutional principles of federalism" in that they allow "the National Government [to] devour the essentials of state sovereignty, though that sovereignty is attested by the Tenth Amendment." 392 U. S., at 203–205.

*Fourth,* the Court argues that the authority of the Secretary of Labor under § 16 (c) to sue for unpaid minimum wages or unpaid overtime, and the Secretary's authority under § 17 to enjoin violations of the Act, "suggest that since private enforcement of the Act was not a paramount objective [of Congress], disallowance of suits by state employees and remitting them to relief through the Secretary of Labor may explain why Congress was silent as to waiver of sovereign immunity of the States." *Ante,* at 286. Again the Court ignores the evidence in the text and legislative history of the 1966 amendments that Congress not only was not "silent" but spoke loudly its purpose to deny the States the protection of sovereign immunity. In any event, the premise that "private enforcement of the Act was not a paramount objective" is wholly unfounded. For the Act's legislative

present case. *Briggs* v. *Sagers,* 424 F. 2d 130, 132–133 (1970). See also *Sanitary District* v. *United States,* 266 U. S. 405, 426 (1925); *United States* v. *California,* 297 U. S. 175, 183–184 (1936); 3 K. Davis, Administrative Law Treatise 459–466 (1958); n. 1, *supra.*

history establishes conclusively that Congress placed great reliance upon the private lawsuit as an important tool for achieving the Act's objectives.[3] To buttress this, the Solicitor General has emphasized in his *amicus curiae* brief that without the private lawsuit, the purpose of the 1966 amendments cannot be achieved, since the Secretary of Labor has neither staff nor resources to take on the enormous number of claims counted upon to be vindicated in private actions. In addition, if state law may preclude actions in state courts,[4] the Solicitor General observes:

> "The unavoidable result is that state employees of schools and hospitals may find themselves in precisely the same situation as the employees in *Parden:* if they are unable to sue their state employer under Section 16 (b) they may be, for all practical purposes, left in the position of having a right without a remedy . . . ." Brief for United States as *Amicus Curiae* 23.[5]

---

[3] See the comprehensive discussion in *Hodgson* v. *Wheaton Glass Co.,* 446 F. 2d 527 (CA3 1971). See also *Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697 (1945); *Hodgson* v. *Ricky Fashions,* 434 F. 2d 1261 (CA5 1970).

[4] See the discussion, *infra,* at 308.

[5] The Solicitor General states that: "In 1971 . . . the Act covered 45.4 million employees and nearly 2 million establishments; 2.7 million of these employees and 118,000 of these establishments were in the sector of state and local government employment, including state schools and hospitals. Yet less than 4 percent of these establishments can be investigated by the Secretary each year." Brief for United States as *Amicus Curiae* 22–23.

On this account, it has been suggested that "the instant case is even more compelling than *Parden* in asserting that Congress' power to regulate commerce should override sovereign immunity. Since the Supreme Court was willing to find constructive waiver of immunity in order to give protection to a relatively small number of people— employees of state owned railways—even where Congress had not

The Court also argues:

"In this connection, it is not amiss to note that § 16 (b) allows recovery by employees, not only of the amount of unpaid wages, but of an equal amount as liquidated damages and attorneys' fees. It is one thing, as in *Parden,* to make a state employee whole; it is quite another to let him recover double against a State. Recalcitrant private employers may be whipped into line in that manner. But we are reluctant to believe that Congress in pursuit of a harmonious federalism desired to treat the States so harshly. The policy of the Act so far as the States are concerned is wholly served by allowing the delicate federal-state relationship to be managed through the Secretary of Labor." *Ante,* at 286.

Here, again, the Court relies upon the rejected argument of the dissent in *Maryland* v. *Wirtz* that the amendments unconstitutionally "overwhelm state fiscal policy." In any event, the purpose of double recovery has not the remotest connection with any design of Congress "in pursuit of a harmonious federalism." Actually its purpose is, in the Court's own words: "as in *Parden,* to make a state employee whole." That was made clear in

made clear its desire that such protection be given, then a fortiori constructive waiver is applicable where Congress has specifically applied legislation to states as employers, where the class of persons meant to be protected is much greater, and where the purpose and need of regulation is a more fundamental and pressing expression of congressional regulation of commerce." 17 Vill. L. Rev. 713, 720–721 (1972).

Finally, the Secretary's enforcement powers are discretionary. Thus, "[a] suit by a state employee under § 216 (b) represents the only remedial provisions of the Act which assures [a state employee] of the opportunity of having his claim presented to a court." 452 F. 2d, at 833 (Bright, J., dissenting).

*Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697, 707–708 (1945):

> "We have previously held that the liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages. *Overnight Motor Co.* v. *Missel,* 316 U. S. 572. It constitutes a Congressional recognition that failure to pay the statutory minimum on time may be so detrimental to maintenance of the minimum standard of living 'necessary for health, efficiency and general well-being of workers' and to the free flow of commerce, that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well-being. Employees receiving less than the statutory minimum are not likely to have sufficient resources to maintain their well-being and efficiency until such sums are paid at a future date. The same policy which forbids waiver of the statutory minimum as necessary to the free flow of commerce requires that reparations to restore damage done by such failure to pay on time must be made to accomplish Congressional purposes."

The answer to the argument that we should be reluctant to believe that Congress "desired to treat the States so harshly" is that Congress extended the FLSA to the States to the extent of the 1966 amendments with full awareness that it was imposing a financial burden. As was cogently said by the Court of Appeals for the Tenth Circuit in *Briggs* v. *Sagers,* 424 F. 2d 130, 133–134 (1970):

> "The legislative history of the 1966 FLSA Amendments reflects that passage was to attain a 'minimum

standard of living necessary for health, efficiency, and general well-being of workers . . . with all deliberate speed consistent with the policy of the act and the welfare of the American people.' [S. Rep. No. 1487, 89th Cong., 2d Sess., 3 (1966).] *This demonstrates to our satisfaction that Congress contemplated the financial burden that the Amendments could cause for the states. But the overall purpose of the FLSA tacitly suggests that the imposition of such strain is outweighed by the underlying policy of the Act.*" (Emphasis added.)

Finally, the Court suggests that to deny the employees a federal forum will not leave them without a right of action for damages since § 16 (b) authorizes suits in "any court of competent jurisdiction," and "[a]rguably, that permits suit in the Missouri courts." *Ante,* at 287. I am puzzled how the Court reconciles the implication that petitioners might maintain their § 16 (b) action in state court with its basic holding that only "clear" expression by Congress can be taken as "lifting the sovereignty of the States and putting the States on the same footing as other employers." *Ibid.* But, in any event, plaintiffs in *Parden* might also have sued in state courts since FELA jurisdiction is "concurrent with that of the courts of the several States," 45 U. S. C. § 56. Yet, we held that this was irrelevant to the issue of amenability of States to FELA suits in federal court since "Congress did not intend this language to limit the jurisdiction of the federal courts, but merely to provide an alternative forum in the state courts." 377 U. S., at 190 n. 8.

## II

Congress can, of course, readily repair the deficiency the Court finds today in the FLSA simply by amending the Act expressly to declare that a State that engages in an

enterprise covered by the 1966 amendments shall be amenable to suit under § 16 (b) in federal court. A greater reason for concern, therefore, is with the Court's and my Brother MARSHALL's treatment of the Eleventh Amendment and the doctrine of sovereign immunity as constitutional limitations upon the power of a federal court to entertain a suit brought against a State by one of its citizens. Since the Court's treatment differs from my Brother MARSHALL's in substantial respects, I shall discuss the two separately.

## III

*Parden* regarded the Eleventh Amendment to be inapplicable to suits against a State brought by its own citizens in federal court and held that whether the FELA suit was maintainable turned on the availability to Alabama of the protection of the ancient doctrine of sovereign immunity. Yet the Court says, *ante,* at 284, that "[t]he history and tradition of the Eleventh Amendment indicate that by reason of that barrier a federal court is not competent to render judgment against a nonconsenting State." Any intimation in that statement that we may infer from the Eleventh Amendment a "constitutional immunity," *ante,* at 285, protecting States from § 16 (b) suits brought in federal court by its own citizens, must be rejected. I emphatically question, as I develop later, that sovereign immunity is a constitutional limitation upon the federal judicial power to entertain suits against States. Indeed, despite some assumptions in opinions of this Court, I know of no concrete evidence that the framers of the Amendment thought, let alone intended, that even the Amendment would ensconce the doctrine of sovereign immunity. On its face, the Amendment says nothing about sovereign immunity but enacts an express limitation upon federal judicial power. It is familiar history that it was adopted

as the response to the Court's decision in *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), that construed Art. III, § 2, of the Constitution—that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution . . . between a State and Citizens of another State"—to extend to a suit in federal court brought by individual citizens of South Carolina against the State of Georgia. An outraged outcry of financially embarrassed debtor States fearful of suits in federal court greeted that decision and resulted in the immediate proposal, and fairly prompt adoption, of the Eleventh Amendment. But all that the Amendment provides in terms is that "[t]he Judicial power of the United States shall *not* be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State" (emphasis added). The literal wording is thus a flat prohibition against the federal judiciary's entertainment of suits against even a consenting State brought by citizens of another State or by aliens. In the very year the Amendment was formally ratified, 1798, this Court gave it that sweep in holding that "the amendment being constitutionally adopted, there could not be exercised any jurisdiction, *in any case,* past or future, in which a state was sued by the citizens of another state . . . ." *Hollingsworth* v. *Virginia,* 3 Dall. 378, 382 (1798) (emphasis added). It is true that cases since decided have said that federal courts do have power to entertain suits against consenting States. None has yet offered, however, a persuasively principled explanation for that conclusion in the face of the wording of the Amendment. Since the question whether the Eleventh Amendment constitutionalized sovereign immunity as to noncitizen suits should, therefore, be regarded as open, or at least ripe for further consideration, it is unfortunate that the

Court, by referring to the Amendment in this case after *Parden* held it to be inapplicable, should lend support to the argument that the Amendment reflects the existence of a constitutional bar to suits against a State brought by its own citizens.

In a nation whose ultimate sovereign is the people and not government, a doctrine premised upon kingship—or, as has been suggested, "on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends," *Kawananakoa* v. *Polyblank,* 205 U. S. 349, 353 (1907)— is indefensible "if it represents, as the Court has more than once intimated, an unfortunate excrescence of a political and legal order which no longer enlists support . . . ." C. Jacobs, The Eleventh Amendment and Sovereign Immunity 160 (1972). Mr. Justice Frankfurter reminded us:

> "The course of decisions concerning sovereign immunity is a good illustration of the conflicting considerations that often struggle for mastery in the judicial process, at least implicitly. In varying degrees, at different times, the momentum of the historic doctrine is arrested or deflected by an unexpressed feeling that governmental immunity runs counter to prevailing notions of reason and justice. Legal concepts are then found available to give effect to this feeling . . . ." *Larson* v. *Domestic & Foreign Corp.,* 337 U. S. 682, 709 (1949) (dissenting opinion).

*Ex parte Young,* 209 U. S. 123 (1908), as well as its numerous progeny, holding that a federal court may enjoin state officers from enforcing an unconstitutional statute, was a notable example of a "[l]egal concept . . . found available to give effect to this feeling" that "governmental immunity runs counter to prevailing notions of

reason and justice." *Parden* was another example. The Court's discussion today of the inapplicable Eleventh Amendment regrettably tends to exalt governmental immunity over "prevailing notions of reason and justice." It also casts a shadow upon the validity of the view expressed by Mr. Chief Justice Marshall in *Cohens* v. *Virginia,* 6 Wheat. 264 (1821), that the Amendments did not apply to bar federal-question suits brought against a State by its own citizens. It had been argued in that case that:

> "The original clause .[Art. III] giving jurisdiction on account of the character of the parties, as aliens, citizens of different States, etc. does not *limit,* but *extends* the judicial power of the Union. The [Eleventh] amendment applies to that alone. It leaves a suit between a State and a citizen, arising under the constitution, laws, etc. where it found it; and the States are still liable to be sued by a citizen, where the jurisdiction arises in this manner, and not merely out of the character of the parties." *Id.,* at 348–349 (emphasis added).

Mr. Chief Justice Marshall adopted this interpretation. In determining whether a writ of error was a "suit" within the meaning of the Eleventh Amendment, he said:

> "If this writ of error be a suit in the sense of the 11th amendment, it is not a suit commenced or prosecuted 'by a citizen of another State, or by a citizen or subject of any foreign State.' It is not then within the amendment, but is governed entirely by the constitution as originally framed, and we have already seen, that *in its origin, the judicial power was extended to all cases arising under the constitution or laws of the United States, without respect to parties." Id.,* at 412 (emphasis added).

In other words, the view of the great Chief Justice was that the Eleventh Amendment expressly withdrew the federal judicial power originally granted in federal-question cases only as to suits against States by citizens of other States or by aliens. I do not read *Hans* v. *Louisiana,* 134 U. S. 1 (1890), as has been suggested, Jacobs, *supra,* at 109, to reject Mr. Chief Justice Marshall's view that a State may be sued in federal court by its own citizens under the federal-question clause. *Hans* was also a suit against a State by its own citizens. The Court in *Hans* held that the Eleventh Amendment was inapplicable in such case (and *Parden* followed this holding), but that the State nevertheless enjoyed the protection of the ancient doctrine, inherent in the nature of sovereignty, that a State is not amenable to the suit of an individual without its consent. 134 U. S., at 10–15. Thus, even if the Eleventh Amendment is a constitutional restraint upon suits against States by citizens of another State, *Hans* accords to nonconsenting States only a nonconstitutional immunity from suit by its own citizens. True, Mr. Chief Justice Marshall's statement of the principle in *Cohens* v. *Virginia,* created a paradox: "a citizen with a claim under the Constitution or federal law against his own state might sue in the federal courts, while a citizen of another state or an alien, parties exercising much less, if any, influence upon the government of the state for its beneficence, would be denied a federal remedy." Jacobs, *supra,* at 91. *Hans* recognized that Mr. Chief Justice Marshall in *Cohens* v. *Virginia,* had said that, nevertheless, the federal-question clause of the Constitution should be read as making a State amenable to suit by one of its own citizens. 134 U. S., at 19–20. This Court gives particular weight to pronouncements of Mr. Chief Justice Marshall upon the meaning of his con-

temporaries in framing the Constitution. The *Hans* treatment of *Cohens* does not constitute an exception. The statement, *id.*, at 20 that the "observation was unnecessary to the decision . . . and . . . ought not to outweigh the important considerations referred to which lead to a different conclusion" implies at most a reservation. Whatever significance may be attached to the statement, however, the *Hans* opinion as an entirety can sensibly be read as resting the judgment squarely upon the ancient nonconstitutional doctrine of sovereign immunity. *Hans'* resolution of the paradox, in other words, was that, independently of any constitutional provision, such suits against a nonconsenting State by its own citizens are barred by sovereign immunity. It must, therefore, be reason for regret if the Court today, by its discussion of the Eleventh Amendment, suggests a constitutional limitation on the federal judicial power—a limitation that could have far-reaching and untoward consequences. As one commentator has observed:

> "If, as has been suggested, the American doctrine of sovereign immunity is indefensible upon both theoretical and pragmatic grounds—if it represents, as the Court has more than once intimated, an unfortunate excrescence of a political and legal order which no longer enlists support—its continued observance should depend upon whether it is incorporated into the Constitution and hence made obligatory upon the judiciary unless waived by the government. It is clear enough, of course, that if the doctrine is to have constitutional status, it must be judicially inferred. There is absolutely nothing in the original Constitution nor in any of the amendments expressly sanctioning the doctrine. And to this generalization the Eleventh Amendment,

despite the outcry about sovereign immunity and the sovereignty of the states which preceded its adoption, does not constitute an exception. That amendment, to be sure, did impose a limitation upon the federal judicial power with respect to suits brought against the states by certain classes of individuals, but its language does not support the Court's far-reaching statement that 'as to the states, legal irresponsibility was written into the Eleventh Amendment.' [*Keifer & Keifer* v. *Reconstruction Finance Corp.,* 306 U. S. 381, 388 (1939).]" Jacobs, *supra,* at 160.

### IV

My Brother MARSHALL takes a much different approach. He agrees, contrary to the Court, that *Parden* forecloses a State sued under § 16 (b) in federal court (and, he concludes, also in state court) from relying on the protection of the ancient doctrine of sovereign immunity, since the States surrendered their sovereignty to congressional control to that extent when Congress was given the Commerce power. Nevertheless, my Brother MARSHALL would affirm the judgment of the Court of Appeals on the basis of a construction that Art. III, even before the adoption of the Eleventh Amendment and independently of the ancient doctrine of sovereign immunity, implicitly barred federal courts from entertaining suits brought by individuals against nonconsenting States. The Eleventh Amendment, he argues, is simply a reaffirmation of that implicit constitutional limitation on the federal judicial power after this Court held otherwise in *Chisholm* v. *Georgia,* 2 Dall. 419 (1793). Then, while admitting that the Eleventh Amendment is not literally applicable to suits brought against a State by its own citizens, he reads *Hans* v. *Louisiana, supra,* as applying the so-called jurisdictional bar of Art. III to such

suits. Thus, he concludes that the present suit is beyond the judicial power of the federal courts, unless the State of Missouri is found to have consented. Moreover, his theory compels him to the paradoxical conclusion that Missouri can frustrate petitioners' vindication of their federally created rights in federal court, but is powerless to deny them vindication of those rights in its own courts.[6]

Jurisdiction of the suit before us is general federal-question jurisdiction under Art. III, § 2, cl. 1. That provision, of course, contains no exemption of States, and on its face obviously grants no form of immunity to the States. Rather, the more plausible reading of the plain words of the Article is that they extend federal judicial power to federal-question controversies between a State and individuals, whether citizens or noncitizens of the State. That certainly was the construction of the Article "as originally framed" expressed by Mr. Chief Justice Marshall in *Cohens* v. *Virginia, supra.* The Amendment overruled *Chisholm* v. *Georgia* to except suits by citizens of other States and by aliens, and thus was the ultimate resolution of the vehement protests of debtor States voiced during the ratification period. Those States feared that Art. III might expose them to suits in federal courts by out-of-state and alien creditors. *Chisholm* proved that the fears were justified. See Jacobs, *supra,* at 27–40; *Hans* v. *Louisiana, supra,* at 10–15. Madison and

---

[6] My Brother MARSHALL disagrees with the Court on this issue. He takes the position that the state courts *must* entertain suits under the FLSA and, in such case, the State is foreclosed from relying on the protection of the ancient doctrine of sovereign immunity. The Court, on the other hand, although stating that it "is a question we need not reach," takes the position that state employees "arguably" may maintain a § 16 (b) suit in the state courts, *ante,* at 287, thus implying that the States are not necessarily compelled to entertain such suits.

Hamilton, along with John Marshall, had replied to these critics during the ratification period that suits against a State could only be maintained where the State has consented (as, for example, where the State is the plaintiff or an intervenor). This was not because of anything in Art. III, implicit or otherwise; rather, it was because "[i]t is inherent in the nature of sovereignty, not to be amenable to the suit of an individual *without its consent.*" The Federalist No. 81 (Hamilton). *Hans* v. *Louisiana* conceded, *arguendo,* that there was federal-question jurisdiction to maintain the suit, but nevertheless concluded that the State was immune from suit. However, as was the case in the responses of Madison, Hamilton, and John Marshall to the critics of the ratification period, the Court, in my view, based its decision, not on some alleged jurisdictional prohibition drawn from Art. III, but rather on the principle that, independently of any constitutional provision, such suits are barred by sovereign immunity where the State has not voluntarily surrendered its immunity. Otherwise, there would have been no reason for the Court's lengthy quotation from Hamilton's definition of the ancient doctrine:

> "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. *Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States . . . .*" 134 U. S., at 13, quoting from The Federalist No. 81 (Hamilton) (second emphasis added).

And the Court in *Hans* referred several times to the opinion of Mr. Justice Iredell in *Chisholm* v. *Georgia,*

eventually concluding that Mr. Justice Iredell's views "were clearly right." *Id.,* at 14. Yet Mr. Justice Iredell did not suggest that Art. III contained an implicit, absolute jurisdictional bar against federal court suits brought by an individual against a State. On the contrary, his position, similar to that of Hamilton, was that unless a State consents, as it must be taken to have done where, for example, the suit involves an activity as to which the States surrendered their sovereignty in forming the Constitution, the States are protected by the ancient doctrine of sovereign immunity from being subjected to suit in federal court at the instance of individuals. Thus, Mr. Justice Iredell stated:

> "So far as States under the Constitution can be made legally liable to [federal judicial] authority, so far to be sure they are subordinate to the authority of the *United States,* and their individual sovereignty is in this respect limited. But it is limited no farther than the necessary execution of such authority requires. The authority extends only to the decision of controversies in which a State is a party, and providing laws necessary for that purpose. That surely can refer only to such controversies in which a State *can* be a party; in respect to which, if any question arises, it can be determined, according to the principles I have supported, in no other manner than by a reference either to pre-existent laws [common law], or laws passed under the Constitution and in conformity to it.

> .    .    .    .    .

> "If therefore, no new remedy be provided [by Congress under authority granted in the Constitution] . . . it is incumbent upon us to enquire, whether previous to the adoption of the Constitution . . . an action of the nature like this before the Court could have been maintained against one of the States in

the *Union* upon the principles of the common law, which I have shown to be alone applicable. If it could, I think it is now maintainable here . . . ." 2 Dall., at 436–437 (emphasis in original).

And in the end, *Hans* stated: "It seems to us that these views of those great advocates and defenders of the Constitution were most sensible and just; and they apply equally to the present case as to that then under discussion." 134 U. S., at 14–15. Thus, one cannot find support for interpreting Art. III as a jurisdictional bar in the "views of those great advocates and defenders of the Constitution." [7]

---

[7] In *Hans* v. *Louisiana,* a citizen of Louisiana attacked his State's repudiation of its bond obligations in the state constitution as a violation of the Contract Clause prohibition against passage by States of laws impairing the obligation of contracts. The Court held that the action, although arising under the Constitution and laws of the United States within Art. III, was not maintainable against Louisiana without its consent. My Brother MARSHALL argues in n. 8 of his opinion concurring in the result that my view that *Hans* involved only a question of sovereign immunity is at odds with my view (shared by him at least as to the Commerce Clause) "that at the time the Union was formed the States surrendered that portion of their sovereignty which conflicted with the supreme federal powers." The obvious error is in my Brother MARSHALL's premise that "such a view [as to the commerce power] would seem to compel the conclusion that the States had also *pro tanto* surrendered their common-law immunity with respect to any claim under the Contract Clause." That conclusion is not compelled. My Brother MARSHALL's argument implies that *Hans,* if not read as holding that Art. III created a jurisdictional bar, may be read as holding that Art. III incorporated the ancient doctrine, and as also holding that the States, at least in the case of the Contract Clause, had not surrendered that immunity in forming the Union. I reject, of course, the premise that *Hans* may be read as a constitutional decision. But assuming a reading as holding that Art. III incorporated the ancient doctrine, there would be no inconsistency in holding that, while the States surrendered that immunity in respect to enumerated powers granted by the States to the National. Government, such

In sum, except as the Eleventh Amendment may be read to create a jurisdictional bar against suits by citizens of another State or by aliens, the restriction on the exercise of the federal judicial power in suits against a State brought by individuals derives, not from anything in the Constitution, including Art. III, but from traditional nonconstitutional principles of sovereign immunity. Except, as Hamilton put it, where "there is a surrender of this immunity in the plan of the convention," in which case in my view consent is irrelevant, Art. III *extends* rather than *bars* exercise of federal judicial power to entertain such suits against consenting States, leaving open only the question whether the State in fact consented or may be deemed to have consented. *Hans* was a "sovereign immunity" case pure and simple; no alleged bar in either Art. III or the Eleventh Amendment played

---

as the commerce power, there was no surrender in respect to self-imposed prohibitions, as in the case of the Contract Clause. In other words, my Brother MARSHALL's "supreme federal powers" are only the enumerated powers whose effective exercise required surrender of the protection of the ancient doctrine. The Commerce Clause is an enumerated power whose effective enforcement required surrender of immunity to empower Congress, when necessary, to subject the States to suit. The Contract Clause, on the other hand, is not an enumerated power and thus not among the "supreme federal powers." It is simply a prohibition self-imposed by the States upon themselves and it granted Congress no powers of enforcement by means of subjecting the States to suit or otherwise. In allowing Louisiana the ancient immunity, the Court in *Hans* took particular care to emphasize that the allowance in no other respect prevented effective enforcement of the prohibitions of the clause. The Court said: "Whilst the State cannot be compelled by suit to perform its contracts, any attempt on its part to violate property or rights acquired under its contracts, may be judicially resisted; and any law impairing the obligation of contracts under which such property or rights are held is void and powerless to affect their enjoyment." 134 U. S., at 20–21.

any role whatever in that decision. Therefore, even if the Eleventh Amendment be read literally to prohibit the exercise of federal judicial power to entertain suits against a State brought by citizens of another State or foreign country (a question we need not decide in this case), my Brother MARSHALL has no support in *Hans* for bringing this suit by a State's own citizens within that prohibition. Stated simply, the holding of *Hans* is that the ancient principles of sovereign immunity limit exercise of the federal power to suits against consenting States. And the fundamental lesson of *Parden,* as my Brother MARSHALL concedes, is that by adopting and ratifying the Commerce Clause, the States surrendered a portion of their sovereignty as to those cases in which state activity touches on the federal regulatory power under the Commerce Clause. "[T]he States by the adoption of the Constitution, acting 'in their highest sovereign capacity, in the convention of the people,' waived their exemption from judicial power. . . . [J]urisdiction . . . was thus established 'by their own consent and delegated authority' as a necessary feature of the formation of a more perfect Union." *Principality of Monaco* v. *Mississippi,* 292 U. S. 313, 328–329 (1934).

Indeed, if Art. III is an absolute jurisdictional bar, my Brother MARSHALL is inconsistent in conceding that federal courts have power to entertain suits by or against consenting States. For I had always supposed that jurisdictional power to entertain a suit was not capable of waiver and could not be conferred by consent. It is true that, contrary to the different holding of *Hollingsworth* v. *Virginia,* 3 Dall. 378 (1798), some opinions have assumed that a State may consent to suit in federal court. Jacobs, *supra,* at 107–108. But the opinions making that assumption did not confront my Brother MARSHALL's theory that Art. III contains an implicit juris-

dictional bar and, accordingly, do not address the highly provocative ancillary question whether such a bar would prohibit federal courts from entertaining suits even against consenting States. Doubtless because my Brother MARSHALL's theory did not occur to the judges, those cases (which did not arise under statutes like the FELA and FLSA) were treated as requiring decision, not in terms of my Brother MARSHALL's theory of a jurisdictional bar that may be removed only by actions tantamount to voluntary consent, but rather within the bounds of traditional notions of sovereign immunity—an immunity, I repeat, that my Brother MARSHALL agrees the States surrendered, as Hamilton said, "in the plan of the convention," at least insofar as Congress conditions a State's engagement in a regulated interstate enterprise upon amenability to suit. Yet, he argues that, while the surrendered immunity cannot arise to defeat a suit in *state* court under § 16 (b), it may be resurrected from the grave solely that it may be waived to lift the purported jurisdictional bar of Art. III to state employees' suits in *federal* court under § 16 (b). That reasoning, I say with all respect, simply defies logic. Indeed, even if *Hans* is a constitutional decision, and I do not think it is, at most it holds that Art. III is to be read to incorporate the ancient doctrine of sovereign immunity. But my Brother MARSHALL's reliance on *Hans* would fare no better in such case, for then the surrender of the immunity "in the plan of the convention" would obviously foreclose assertion of the immunity in suits in both state and federal courts brought under federal statutes founded on the commerce power.

## V

"We the People" formed the governments of the several States. Under our constitutional system, therefore, a State is not the sovereign of its people. Rather, its

people are sovereign. Our discomfort with sovereign immunity, born of systems of divine right that the Framers abhorred, is thus entirely natural. The discomfort has markedly increased since subsidence of the controversy over judicial review of state decisions that was fought out in terms of the amenability of States to suit in federal court. Jacobs, *supra*, at 41–74. *Ex parte Young*, 209 U. S. 123 (1908), substantially eviscerated governmental immunity in holding that individuals might sue in federal court to enjoin state officers from enforcing unconstitutional statutes. Congress, reflecting agreement with the soundness of the view that "the doctrine of Ex parte Young seems indispensable to the establishment of constitutional government and the rule of law," C. Wright, Handbook of the Law of Federal Courts 186 (2d ed. 1970), accepted that decision. *Perez* v. *Ledesma*, 401 U. S. 82, 104–110 (opinion of BRENNAN, J.). In short, the trend since *Hans* was decided in 1890 has been against enforcement of governmental immunity except when clearly required by explicit textual prohibitions, as in the Eleventh Amendment. Moreover, as *Parden* illustrates, the trend also is to interpret those prohibitions narrowly and literally. For none can gainsay that a State may grievously hurt one of its citizens. Our expanding concepts of public morality are thus offended when a State may escape legal redress for its wrongs. I need not address in this case, however, the question whether today's decision constitutes a denial of the Fifth Amendment's counterpart guarantee of due process. See, however, Jacobs, *supra*, at 163–164. Our constitutional commitment, recited in the Preamble, is to "establish Justice." That keystone objective is furthered by the trend toward limitation of the defense of governmental immunity represented by *Ex parte Young* and *Parden*. Today, however, the Court and my Brother MARSHALL arrest the trend—the Court by watering down *Parden* in reliance

on the *Parden* dissent and in its discussion of the inapplicable Eleventh Amendment, and my Brother MARSHALL by rejecting Mr. Chief Justice Marshall's view that no jurisdictional bar may be implied in Art. III.

I would reverse the Court of Appeals and remand the case to the District Court with direction to proceed to trial on the complaint.