**In the Matter of Leonard CRISP, Bankrupt.**

**STATE OF CONNECTICUT, COMMISSIONER OF FINANCE AND CONTROL, Appellant,**

v.

**Leonard CRISP, Appellee.**

**No. 1004, Docket 74–2690.**

United States Court of Appeals, Second Circuit.

Argued May 9, 1975.

Decided July 31, 1975.

Edward F. Pasiecznik, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., on the brief), for appellant.

William McCoy, Certified Student Intern (Katalin Eve Roth, University of Connecticut Law School Legal Clinic, West Hartford, Conn., on the brief), for appellee.

Before FEINBERG, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

FEINBERG, Circuit Judge:

The Commissioner of Finance and Control of the State of Connecticut appeals from an order of Chief Judge T. Emmet Clarie of the United States Court for the District of Connecticut, which confirmed an order of Bankruptcy Judge Saul Seidman and dismissed the Commissioner's petition for review. The bankruptcy judge found that a debt owed by the bankrupt-appellee Leonard Crisp to the State for treatment at a state psychiatric hospital was dischargeable in bankruptcy. Appellant Commissioner claims that this debt may not be discharged because it is not provable under the Bankruptcy Act, because the creditor State has not waived its sovereign immunity, and because discharge is barred by the eleventh amendment. We affirm.

I

Leonard Crisp filed a voluntary petition for bankruptcy on March 8, 1974. The attached schedules listed the Connecticut Department of Finance and Control as an unsecured creditor having a non-priority claim of $1,623.65, which was disputed. This claim arose out of Crisp's hospitalization in Norwich State Hospital. Under section 17–295 of the Connecticut General Statutes, a patient in such a hospital is billed according to his ability to pay. In 1970, Crisp became eligible for Social Security Disability

benefits, and on the basis of this income the Commissioner billed Crisp for treatment at a low per diem rate from November 1970 to June 1972.[1] An "Itemized Statement" rendered April 2, 1974, after the bankruptcy petition was filed, gave Crisp credit for a payment of $70 and showed a balance due of $1,623.65. The actual cost to the State of Crisp's hospitalization was, of course, much greater, amounting to $10,250.82.

In the bankruptcy proceeding, the Commissioner first filed a proof of claim for $1,623.65 and objected to discharge of the scheduled debt in that amount. Then, after some procedural difficulties not now relevant, the Commissioner also filed an application to have the debt declared nondischargeable, a procedure open to him under 1970 amendments to the Bankruptcy Act, see section 17c(1) of the Bankruptcy Act, 11 U.S.C. § 35(c)(1); Bankruptcy Rule 409. The bankruptcy judge held that the debt was dischargeable under section 63a(4) of the Bankruptcy Act, 11 U.S.C. § 103(a)(4), as an open account or as an obligation based upon an implied contract.

The Commissioner appealed to the district court. After hearing testimony from an official of the Department of Finance and Control and oral argument, Chief Judge Clarie dismissed the petition for review and confirmed the order of the bankruptcy judge. This appeal followed.

## II

Appellant's most substantial argument is based upon the claimed unusual nature of Crisp's obligation to the State under Connecticut law. We are told that the amount of Crisp's obligation is not certain because if Crisp acquires more assets at some time in the future, he might become liable for the entire actual cost ($10,250.82) of his hospital treatment or

at least for some portion of it greater than the $1,693.65 he has been billed.

Section 17–295(b) of the Connecticut General Statutes Annotated (1975) provides that if a person receiving care in a state mental hospital "is found unable to pay the per capita cost, [the commissioner of finance and control] shall bill such . . . person . . . at a rate which he finds such person . . . able to pay, provided the total billing . . . shall not exceed the per capita cost." [2] Section 17–295(c) makes the "patient . . . legally liable . . for the support of [himself] in such institution in accordance with his ability to pay. . . ." However, another provision, confusingly codified as section 17–295b, imposes upon the patient "who . . . has received care" the further liability "to reimburse the state for any unpaid portion of per capita cost" in accordance with standards for reimbursement applicable chiefly to public assistance recipients. These give the State a priority claim over all other unsecured claims against "property of any kind or interest in any property, estate or claim of any kind," which the beneficiary of state aid may acquire, "for the full amount paid to him or in his behalf. . . ." C.G.S.A. § 17–83e. Upon the patient's death, the State has a claim against his estate to the extent it is not needed for support of spouse and children with priority over all unsecured claims, except minimal allowances for medical, funeral, burial, and administrative expenses, for "all amounts paid on behalf of . . . such person . . for which the state has not been reimbursed . . . ." C.G.S.A. § 17–83g; see also § 17–300.

Under section 295(b) and (c), Crisp was billed only $1,693.65 as the amount he was found "able to pay." The Commissioner argues, however, that section 295b imposes an additional liability, which

---

1. The rate was initially $4.15 per day and was increased to $4.565 in 1971, when Crisp's disability allowance was raised.

2. The "cost per capita per week for the support of persons in state humane institutions"

is calculated annually by the state comptroller, and is apparently the actual cost of the care and treatment provided. C.G.S.A. § 17–295(a).

may arise at any time in the future when Crisp becomes able to pay it, for all or part of the additional unbilled cost of treatment. Testimony before Judge Clarie revealed that the State has enforced such an obligation "twenty years" after the hospitalization. The precise amount of the additional claim cannot now be known, according to appellant, because it depends on the patient's future success in acquiring assets. Therefore, since the claim cannot now be liquidated, it is neither provable nor allowable and cannot be discharged.

■ Section 63a of the Bankruptcy Act lists nine categories of debts which may be proved, including in subdivision (4) those which are founded upon "a contract express or implied." Provision of care to an incapacitated person is a traditional example of a situation giving rise to quasi-contractual liability. See Restatement of Restitution §§ 112, 113 (1937). Although the care here has been provided by the state rather than by a private person, the analogy still seems appropriate. However, the State has limited the patient's quasi-contractual obligation in sections 295(b) and (c) to the amount he is able to pay. Even if the source of the liability is regarded as purely statutory, the bankruptcy court in the exercise of its equitable powers could denominate it quasi-contractual to establish provability and dischargeability. See 3A Collier, Bankruptcy ¶ 63.24, at 1889–91 (14th ed. rev. 1972). As in *Nathanson v. NLRB*, 344 U.S. 25, 27, 73 S.Ct. 80, 82, 97 L.Ed. 23 (1952), the liability "is an indebtedness arising out of an obligation imposed by statute—an incident fixed by law to the . . . relationship," here that between hospital and patient. Crisp's obligation is thus an ex-ample of a liability created by statute, which "is quasi contractual in its origin and basis." *Brown v. O'Keefe*, 300 U.S. 598, 606, 57 S.Ct. 543, 548, 81 L.Ed. 827 (1937). "A liability upon quasi contract is one upon an 'implied contract,' and so provable in bankruptcy [section 63a(4), other citations omitted], if the other conditions of allowance are found to be fulfilled." *Id.* at 607, 57 S.Ct. at 548.

Quoting from *State v. Romme*, 93 Conn. 571, 107 A. 519 (1919), Connecticut argues that the debt is not provable under section 63a(4) because in providing social services the State "enters into no contract relation." But characterization of an obligation as quasi-contractual for purposes of discharge in bankruptcy does not establish a "contract relation." Cf. 3A Collier, *supra*. It merely describes the legal effect of actions the parties have taken for purposes of application of the "implied contract" provision of section 63a(4). Moreover, in *Romme* the State had made a claim against the estate of a patient, who had been institutionalized, for the expense of caring for her. The court made the quoted statement in the context of answering a claim that the statute allowing such a claim impaired the obligation of contract between the patient and the state. The court's description of the relationship, 107 A. at 520, actually supports our conclusion that the bankruptcy judge here properly characterized the claim as quasi-contractual.[3]

■ We turn now to the Commissioner's principal point that whatever the basis of Crisp's debt, it is not dischargeable. The argument is based upon sections 57d and 63d of the Bankruptcy Act, 11 U.S.C. §§ 93(d), 103(d). The latter provides:

---

**3.** We do not find it necessary to consider the bankruptcy judge's alternative holding that the debt was provable as an "open account" under § 63a(4). There are a number of indicia of an open account present here; e. g., the State sent Crisp an "Itemized Statement," showing the $1,623.65 as a "balance due," and a letter offering to set up "some sort of monthly payment plan" "to pay off" Crisp's "account"; the State even demanded judgment for this sum. On the other hand, any increase in Crisp's liability on the account would result not from receipt of additional goods or services on credit from the State, but from actions over which the creditor (State) has no control. The account is thus quite unlike the normal commercial running account which this provision is designed to cover. See 3A Collier, *supra*, ¶ 63.22.

Where any contingent or unliquidated claim has been proved, but, as provided in subdivision d of section 57 of this Act, has not been allowed, such claim shall not be deemed provable under this Act.

The former provides, in relevant part:

[A]n unliquidated or contingent claim shall not be allowed unless liquidated or the amount thereof estimated in the manner and within the time directed by the court; and *such claim shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation* or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this Act. [Emphasis added.]

The Commissioner argues that since Crisp's obligation may, under Connecticut law, increase if he acquires windfall assets, the claim is too uncertain to be allowed. This contention was rejected by the bankruptcy judge on his view that the Connecticut statutes did not subject Crisp to possible future retroactive liability. The bankruptcy judge distinguished *State v. Murzyn,* 142 Conn. 329, 114 A.2d 210 (1955), which he considered the leading authority, on the ground that the statutory scheme had been amended four years later to eliminate retroactive liability. On this theory, the claim made by the Commissioner for $1,623.65 was not uncertain at all, since no future event could affect it.

With some diffidence in this area of Connecticut law, we believe that the bankruptcy judge, and therefore the district court, probably erred in this assessment of Crisp's possible liability. A Connecticut decision after the statutory amendments relied on by the bankruptcy judge construed the present C.G.S.A.

§ 17–295 to allow retroactive billing. *State v. Dickinson,* 4 Conn.Cir. 81, 225 A.2d 841 (1966). Moreover, as indicated above, the Commissioner also relies on an even later statute, the present section 295b, to support a future retroactive claim and this statute was not mentioned by the bankruptcy judge. Nevertheless, for reasons indicated below, we believe that the bankruptcy judge reached the right result.

Assuming arguendo that appellant has correctly stated Crisp's potential obligation to the State, the question to be decided is whether the Commissioner's claim is now "capable of liquidation or of reasonable estimation." "What infusion of contingency will vitiate a claim is at best a question of degree [see *Maynard v. Elliott,* 283 U.S. 273, 277–78, 51 S.Ct. 390, 75 L.Ed. 1028 (1931)], though there is a leaning toward allowance in aid of the purpose of the statute to relieve the honest debtor." *Brown v. O'Keefe, supra,* 300 U.S. at 606, 57 S.Ct. at 548. The decision "ultimately rest[s] upon the exercise of judicial discretion in light of the circumstances of the case." 3A Collier, *supra,* ¶ 63.30, at 1912. Even under the Commissioner's construction of the relevant statutes, Crisp's liability for the cost of his hospitalization is not completely contingent; it already exists.[4] Only the amount of the obligation is subject to the contingency of Crisp's future income. However, at any particular time the amount of the debt is known. It is fixed by state law at the sum the Commissioner has determined the patient able to pay. Thus, the claim is liquidated when a bill is rendered, even if it is subject to increase. This is not a mere "arbitrary" estimate, see 3 Collier, *supra,* ¶ 57.15[3.3], at 264 (rev.1974), but rather an accurate statement of the debt at that time. Moreover, the possibility

---

**4.** Indeed, the Director of the Division of Central Collection of the Department of Finance and Control testified before Judge Clarie as follows:

The Witness: . . . [I]f this part of the debt [i. e., the $1,623.65 already billed] is dischargeable, we still have the individual responsible for the balance.

The Court: For the difference?
The Witness: Yes. But actually this man right now has a potential liability of $10,-180.82 [i. e., the total cost of treatment less Crisp's $70 payment].

that the debt may be increased is still "capable of . . . reasonable estimation" under section 57d. Whether the bankruptcy court would liquidate the debt at the maximum of $10,250.82, the per capita cost already fixed, or at some lesser amount would depend on the evidence before the court, e. g., the source of any possible windfall, the Commissioner's practice if the bankrupt's wages merely increase.[5]

· Indeed, appellee argues that the very contingency of the obligation makes the State's claim provable as a "contingent debt" under section 63a(8), 11 U.S.C. § 103(a)(8). The question is one of some difficulty. According to Collier, *supra,* ¶¶ 57.15, 63.23, 63.30, there is at least doubt whether a debt is provable solely because it is contingent. Rather, section 63a(8) may insure that no debt of a type otherwise provable under section 63a will be denied proof because it is contingent. Since section 63a(8) may not have been intended to establish a completely new category of provable debts, it might be incorrect to allow proof of a claim on the basis of section 63a(8) alone. On the other hand, if section 63a(8) is to be given any independent meaning, see, e. g., 3 Collier, *supra,* ¶ 57.15[2], at 251–53, the debt in this case would appear to be the

kind of obligation which should be covered.[6] On this view, the limitation of section 57d should not be too rigidly applied. In any event, we believe the debt is "capable of . . . reasonable estimation" under section 57d and is therefore allowable, so that the bankruptcy judge's denial of the Commissioner's application to have the debt declared nondischargeable was correct.[7]

The result we reach is in complete accord with the objectives of the Bankruptcy Act. Crisp is apparently a typical "honest debtor." His obligation was incurred when he was unable to work and required the care and treatment which gave rise to the Commissioner's claim. After Crisp's discharge in bankruptcy, one hopes he will be able to meet his current obligations and perhaps earn his own way.[8] It would frustrate the remedial purposes of the Bankruptcy Act if, when Crisp was finally self-supporting, the State could suddenly appear and assert a claim for over $8,000 for medical care rendered years before. Such a possibility would deny Crisp "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Perez v. Campbell,* 402 U.S. 637, 648, 91 S.Ct. 1704, 1710, 29 L.Ed.2d 233 (1971)

---

5. The director of the Division of Central Collection testified that the State's policy was as follows:

   If we became aware of Mr. Crisp coming into any sudden or unexpected wealth, other than normal employment, we would seek to recover from him or his estate the unpaid charges.

6. We note that, according to appellee, he moved before the bankruptcy judge for leave to amend his schedules to show the Commissioner's claim at $12,000, well over the full per capita cost. The motion was not acted upon, but appellee suggests that had it been granted, any possible uncertainty would have disappeared.

7. The State cites *Thompson v. England,* 226 F.2d 488 (9th Cir. 1955), as an analogous case where a claim was not allowed. There, the bankrupt's wife filed a claim for a $12,000

debt which her husband had agreed to repay "as soon as [his] business is in a sound financial position." The court held that the occurrence of this contingency was so fortuitous and difficult to predict, both because it required the business to be started again and because it required the bankrupt to achieve business success, that § 57d precluded allowance of the claim. *Thompson* is distinguishable here because of the strong possibility of collusion between husband and wife to the injury of other creditors, and because the debt there had no ascertainable present value at all. In contrast, Crisp's debt is for a fixed amount at any particular time.

8. Papers filed by the State before the bankruptcy judge indicate that as of May 1974, Crisp was employed at a full time job although he continued to reside in Norwich Hospital. Billing for his care after 1972 was apparently made on an account not involved in this suit.

(citations omitted). As a result of the decisions below, the State will be unable to press such a claim.[9]

## III

■ The Commissioner also argues that the eleventh amendment bars discharge of Crisp's debt without the consent of Connecticut. But the eleventh amendment does not apply here at all. It protects a state from federal court money judgments necessarily paid out of the state treasury. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The action must be "in essence one for the recovery of money from the state." Id., quoting *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). In this case, Crisp is not seeking any payment from the State treasury. A judgment of dischargeability in the bankruptcy proceeding does not now deplete Connecticut's coffers by a penny. Indeed, distribution of Crisp's assets at the close of the bankruptcy proceeding may even put the State a few dollars ahead.

The State also urges that is has not waived its sovereign immunity from suit. To the extent that in this context this is a different argument from the one based on the eleventh amendment, see, e. g., *Employees v. Department of Public Health & Welfare*, 411 U.S. 279, 287–89, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) (Marshall, J., concurring); Id. at 298, 309–15, 93 S.Ct. 1614 (Brennan, J., dissenting), it is equally unavailing. In the first place, the State is not being sued here, so there is no cause to raise what is essentially a defense.

■ Secondly, Article I, section 8, clause 4 of the Constitution specifically grants Congress the power to enact bankruptcy laws, which it has exercised in Title 11 of the United States Code. It is now established that Congress, by enacting the Bankruptcy Act of 1898 and by continuing in effect what is now section 17a(1), 11 U.S.C. § 35(a)(1), intended to make debts owed to the state and federal governments dischargeable. *Guarantee Title & Trust Co. v. Title Guaranty & Surety Co.*, 224 U.S. 152, 155, 160, 32 S.Ct. 457, 56 L.Ed. 706 (1912); *Hilliard v. DeCiuceis*, 115 N.Y. S.2d 5, 202 Misc. 197 (Sup.Ct.N.Y.Co. 1952); 1A Collier, *supra*, ¶ 17.13 (rev. 1975). Any exception for a particular kind of state debt should come from Congress, not from us.[10]

■ Finally, Connecticut has waived any immunity it arguably might have by filing its proof of claim. Connecticut was not obliged to follow this course, but it invoked the jurisdiction of the bankruptcy court in an attempt to benefit itself. By doing so, Connecticut waived any possible sovereign immunity. Cf. *Clark v. Barnard*, 108 U.S. 436, 447–48, 2 S.Ct. 878, 27 L.Ed. 780 (1883).

The judgment of the district court is affirmed.

VAN GRAAFEILAND, Circuit Judge (concurring):

I concur in the holding that the contingent claim of the State was dischargeable in appellee's bankruptcy proceedings. My only concern is that the bankruptcy judge did not attempt to liquidate the contingency or estimate the amount thereof as required by section 57d of the Bankruptcy Act, 11 U.S.C. § 93(d). The claim, as allowed, was for the amount due and owing at the time of the bankruptcy.

However, since appellee's motion to amend his schedules to include the full

---

9. See § 14f(2) of the Act, 11 U.S.C. § 32(f)(2):

(f) An order of discharge shall— . . .

. . . . .

(2) enjoin all creditors whose debts are discharged from thereafter instituting or continuing any action or employing any process to collect such debts as personal liabilities of the bankrupt.

10. E. g., Congress recently demonstrated it is well aware of the problem of bankruptcy discharge of debts owed to states for social services by specifically exempting from dischargeability "a child support obligation assigned to a State." Pub.L.No.93–647 (Jan. 4, 1975), § 101(a), adding § 456(b) to Title IV of the Social Security Act, 43 U.S.L.W. 153, 159.

amount of the possible contingent liability was not concurred in by the State, it has no cause to complain.

Proper procedures in future cases would, I believe, include an evaluation of the contingent liability by the bankruptcy judge.