FEINBERG, Chief Judge:
 

 In this proceeding, the State of Connecticut challenges the constitutionality of a provision of the Bankruptcy Reform Act of 1978 (the Act), 11 U.S.C. § 523(a)(5)(A), that permits the discharge of child support obligations that have been assigned to the State. The State argues that this provision impermissibly interferes with its exercise of a traditional state function — the collection and enforcement of child support obligations — and therefore exceeds the limits on congressional power imposed by the Tenth Amendment.
 
 [1]
 
 It also claims that the discharge provision violates the Eleventh Amendment
 
 [2]
 
 by permitting “indirect” suits against the states. We conclude that these arguments are without merit, and accordingly affirm the judgment of the bankruptcy court upholding the provision.
 

 I.
 

 The facts and procedural background may be summarized very briefly. The debt- or, George D. Glidden, obtained a divorce decree in October 1973, in connection with which he was ordered to pay $15.00 per week in support of each of his two children. At the time of the divorce, Glidden’s wife and children were receiving public assistance under Connecticut’s program of Aid to Families with Dependent Children (AFDC). As a condition of their continued eligibility for such assistance, Glidden’s wife assigned her rights to the support payments to the State. Glidden subsequently fell behind in these payments until, when he filed his petition in bankruptcy in October 1979, an arrearage of some $2,890 had arisen.
 

 In December 1979, the State filed an objection to the discharge of this debt based on the Tenth and Eleventh Amendments to the Constitution. Acting on cross-motions for summary judgment, Bankruptcy Judge Robert L. Krechevsky of the United States Bankruptcy Court, District of Connecticut, rejected the State’s arguments and granted the requested discharge in a careful and thorough opinion, dated January 5, 1981. By agreement with the debtor pursuant to section 405(c)(1)(B) of the Act,
 
 [3]
 
 the State has appealed directly to this Court. The United States, notified of the State’s challenge to the constitutionality of a federal statute, intervened in the appeal in accordance with 28 U.S.C. § 2403(a), filing a brief and participating in the oral argument of the case.
 

 II.
 

 The statutory provision that Connecticut complains of, section 523(a)(5)(A) of the Act, states in relevant part:
 

 (a) A discharge under section 727,1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
 

 (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a
 
 *87
 
 separation agreement, divorce decree, or property settlement agreement,
 
 but not to the extent
 
 that—
 

 (A)
 
 such debt is assigned to another entity, voluntarily, by operation of law, or otherwise. . . .
 

 (Emphasis added.) The term “entity” is elsewhere defined to include “governmental unit,” see 11 U.S.C. § 101(14), which in turn encompasses “State,” id. § 101(21).
 

 Prior law had not permitted the discharge of debts arising out of a child support obligation assigned to a State. See 42 U.S.C. § 656(b) (1976), repealed by section 328 of Title III of the 1978 Reform Act, 92 Stat. 2679. The revised provision served to expand the scope of dischargeable debts, without any compromise of obligations directly serving their intended purpose of providing support to children or the former spouse. See Sen.Rep.No. 95-598, 95th Cong., 2d Sess. 79, reprinted in [1978] U.S. Code Cong. & Ad.News 5787, 5865.
 

 Connecticut relies principally on the Supreme Court’s decision in
 
 National League of Cities v. Usery,
 
 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which held that the Tenth Amendment bars Congress from enacting legislation under the Commerce Clause, U.S.Const., art. 1, § 8, cl. 3, that “directly displace[s] the States’ freedom to structure integral operations in areas of traditional governmental functions.” Id. at 852. Reasoning that the same analysis should apply to congressional enactments under the bankruptcy power, U.S. Const., art. 1, § 8, cl. 4, the State claims that the discharge provision in question interferes with the State’s “intimate involvement” with the enforcement of child support obligations, an involvement that it traces as far back as a colonial statute of 1699. Though conceding that the federal government has come to play a major role in this as in many other areas of public welfare, the State insists that the collection and enforcement of child support obligations nonetheless remains a matter of traditional state responsibility in Connecticut. It points out, in this connection, that “[ojrders of child support are established in state courts, using state statutory and case law. Enforcement of those orders is left to state investigators, state family relations officers, state deputy sheriffs and state lawyers.” (Footnote omitted.)
 

 At a more concrete level, Connecticut argues that section 523(a)(5)(A), if allowed to stand, will impose a significant economic burden on the State. In the unlikely event that all child support debtors were to file petitions in bankruptcy, the State envisages a possible loss of as much as $1.25 million in annual payments to the State, as well as a loss of $47.1 million in accumulated past child support arrearages. Beyond these financial losses, the State speculates that the discharge provision, acting as “a green light to parents to avoid their duty to support their children,” will prejudice the State’s efforts to enforce current obligations: “[wjhile no figures are presently available, logic dictates that knowledge by an absent parent that unpaid child support may later be discharged can only discourage, not encourage, continuing payment of those support payments.”
 

 We note at the outset that the reasoning of the
 
 National League of Cities
 
 decision, which dealt only with the Commerce Clause power, see 426 U.S. at 852 n.17, 96 S.Ct. at 2474 n.17, has not — so far, at least — been generalized to strike down federal statutes based upon other sources of congressional power. See, e. g.,
 
 Massachusetts v. United States,
 
 435 U.S. 444, 454-60, 98 S.Ct. 1153, 1160-63, 55 L.Ed.2d 403 (1978) (taxing power);
 
 Fitzpatrick v. Bitzer,
 
 427 U.S. 445, 455-56, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976) (section 5 of the Fourteenth Amendment). We also note the uncertain status of the decision on which the State primarily relies in maintaining that the bankruptcy power is subject to Tenth Amendment limitations,
 
 Ashton v. Cameron County Water Improvement District,
 
 298 U.S. 513, 530-32, 56 S.Ct. 892, 896-97, 80 L.Ed. 1309 (1936). We share the doubts so well expressed by Judge Krechevsky that
 
 Ashton
 
 remains a sound basis for a Tenth Amendment analysis of bankruptcy laws, in light of
 
 United States v. Bekins,
 
 304 U.S. 27, 49-54, 58 S.Ct. 811, 814-16, 82 L.Ed. 1137 (1938), and
 
 Pru
 
 
 *88
 

 dential Insurance Co. v. Benjamin,
 
 328 U.S. 408, 433 n.42, 66 S.Ct. 1142, 1157 n.42, 90 L.Ed. 1342 (1945). See also 1 Collier on Bankruptcy ¶ 0.02, at 5-6 (14th ed. 1974).
 

 In this case, however, we need not definitively resolve this problem. We are satisfied, with the bankruptcy judge, that even if
 
 National League of Cities
 
 does apply to Congress’s power “[t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States,” under the circumstances presented in this case the challenged provision does not transgress the limits announced in that decision.
 

 In the first place, we cannot accept Connecticut’s contention that the discharge provision burdens a “traditional [state] governmental function,” as the federal wage and hour laws at issue in
 
 National League of Cities
 
 were found to impinge on “the States’ abilities to structure employer-employee relationships in such areas as fire prevention, police protection, sanitation, public health, and parks and recreation”— all “functions .. . which governments are created to provide, services . . . which the States have traditionally afforded their citizens.” 426 U.S. at 851, 96 S.Ct. at 2474. Here, the federal act does not, as the State claims, affect its freedom to structure services for the promotion of the welfare of its children; rather, it affects the State’s ability to recoup indirectly some of its costs in administering its public assistance program. This system of recoupment is itself, moreover, the product of federal mandate. As Judge Krechevsky observed, the statutory provision requiring the assignment of child support obligations to the State as a condition of eligibility for AFDC assistance, Conn.Gen.Stat. § 17-82b,
 
 [4]
 
 was enacted expressly to meet the condition imposed under Title IV-A of the Social Security Act, 42 U.S.C. § 602(a)(26)(A), making such assignments a precondition to receipt of federal funds for the State’s AFDC program.
 
 [5]
 
 Payments made to the State under these assignments do not even go into Connecticut’s AFDC budget: 35 percent of the total is credited to the United States as a reduction in federal contributions to the AFDC program, while the rest is allocated to the State’s General Fund for unrestricted use.
 

 It thus can hardly be said that the discharge provision compromises an otherwise unhindered freedom on Connecticut’s part to structure a “traditional” or “integral” state governmental function. The -State’s latitude in designing and operating an AFDC program has been circumscribed from the outset by the restrictions set forth in Title IV-A, though it does retain wide discretion in such areas as the setting of benefit levels and eligibility standards within federal limits. See, e. g.,
 
 Quern v. Mandley,
 
 436 U.S. 725, 740, 98 S.Ct. 2068, 2077, 56 L.Ed.2d 658 (1978). The AFDC system as a whole has long been recognized as being “based on a scheme of cooperative federalism,”
 
 King
 
 v.
 
 Smith,
 
 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968)—a scheme that by its very nature anticipates a sharing of responsibility and authority between the cooperating governments.
 

 Against this background, it simply makes no sense to assert that Congress exceeds its constitutional authority when, in an otherwise reasonable exercise of its bankruptcy power, it impairs the value of support obligations assigned to a State — assets that are themselves created at federal instance. In sharp contrast to the statute struck down in
 
 *89
 

 National League of Cities,
 
 the discharge provision at issue here is not an exercise of federal power addressed to “the States in their capacities as sovereign governments,” 426 U.S. at 852, 96 S.Ct. at 2474, that threatens their “ ‘ability to function effectively in a federal system,’ ” id., quoting
 
 Fry v. United States,
 
 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1795 n.7, 44 L.Ed.2d 363 (1975). Its impact, moreover, is only indirect. Indeed, if the State considers the risk of losses through such discharges serious enough, it can act to strengthen its collection capability in order to minimize the amounts of arrearages that are allowed to accrue.
 
 [6]
 

 In light of-these conclusions, we do not think it necessary that the United States show any special justification for the provision, or any extraordinary federal interest behind it. It is enough that Congress has acted reasonably toward the proper end of its bankruptcy power — to “relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh.”
 
 Williams v. United States Fidelity & Guaranty Co.,
 
 236 U.S. 549, 554-55, 35 5.Ct. 289, 290, 59 L.Ed. 713 (1915). The statute promotes this end more broadly than prior law, but still recognizes the genuine interests of the States by maintaining as non-dischargeable debts those obligations that flow directly to their intended beneficiaries. In short, giving proper weight to the federal interest in bankruptcy reform, we see no basis for concluding that the discharge provision is the type of intrusive exercise of congressional power held impermissible in
 
 National League of Cities.
 
 We conclude therefore that the federalist concerns of the Tenth Amendment are not offended by section 523(a)(5)(A) of the Bankruptcy Act.
 

 We turn finally to Connecticut’s Eleventh Amendment argument. The State contends that “[a] proceeding in bankruptcy which requires the state to take affirmative action to protect its right as sovereign from being ‘sued’ by a citizen is constitutionally impermissible under the Eleventh Amendment. To permit otherwise would be to allow a citizen to do indirectly what he is prohibited from doing directly.” We see no merit in this argument, and agree with Judge Krechevsky that our opinion in
 
 In re Crisp,
 
 521 F.2d 172, 178 (2d Cir. 1978), fully answers the State’s contention on this point. The State’s insistence that this case is distinguishable because it did not waive its immunity here, as it did in
 
 Crisp,
 
 id. at 179, is simply incorrect. We left no room for doubt in
 
 Crisp
 
 that the State’s waiver of immunity was an alternative, not a necessary, basis for our rejection of the State’s argument.
 

 The judgment of the bankruptcy court is affirmed.
 

 [1]
 

 . The Tenth Amendment provides:
 

 The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.
 

 [2]
 

 . The Eleventh Amendment provides:
 

 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 

 [3]
 

 .Section 405(c)(1)(B), one of the Act’s transitional provisions, states:
 

 (c)(1) During the transition period, an appeal from a judgment, order, or decree of a United States bankruptcy judge shall be—
 

 (B) if the parties to the appeal agree to a direct appeal to the court of appeals for [the] circuit [in which the bankruptcy judge sits], then to such court of appeals. . . .
 

 See generally In re Riddervold, 647 F.2d 342, 343— 44 (2d Cir. 1981).
 

 [4]
 

 . The Connecticut statute provides in relevant part that, by making an application for AFDC assistance,
 

 the supervising relative shall assign to the commissioner [of income maintenance] the right of support, present, past and future, due all persons seeking assistance and shall assist the commissioner in pursuing support obligations due from the absent parent. Notice of such assignment shall be conspicuously placed on said application and shall be explained to the supervising relative at the time of application.
 

 [5]
 

 . Section 602(a)(26)(A) provides:
 

 (a) A State plan for aid and services to needy families with children must ... (26) provide that, as a condition of eligibility for aid, each applicant or recipient will be required—
 

 (A) to assign the State any rights to support from any other person such applicant may have (i) in his own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid, and (ii) which have accrued at the time such assignment is executed ....
 

 [6]
 

 . It should be noted that the State’s child support collection activities are themselves heavily shaped by federal mandate, notably the provisions of Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-662. Section 654 of this Title, for example, imposes a wide variety of requirements on state child support plans, including an undertaking on the State’s part to comply with federal standards determined “to be necessary to the establishment of an effective program for locating absent parents, establishing paternity, obtaining support orders, and collecting support payments .... ” Id. § 654(13). Thus, even in this area, “integral” state functions are subject to substantial federal influence.