**Maxine GREEN, for herself and for and on behalf of all other persons similarly situated, Plaintiff-Appellant,**

v.

**The STATE OF UTAH et al., Defendants-Appellees.**

No. 75–1424.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted April 13, 1976.

Decided July 29, 1976.

Parker M. Nielson, Salt Lake City, Utah (R. Clark Arnold, Salt Lake City, Utah, on the brief), for plaintiff-appellant.

Larry V. Lunt, Salt Lake City, Utah (Thomas G. Kimble, Salt Lake City, Utah, on the brief), for defendants-appellees.

Before HILL, SETH and DOYLE, Circuit Judges.

HILL, Circuit Judge.

This case comes for review of two orders entered by Judge Ritter. The first order dismissed the action as to the defendants-appellees, the State of Utah, W. Smoot Brimhall (individually and as Commissioner of Financial Institutions of Utah), and Western States Thrift and Loan Company. The second order dismissed the class action.

The lawsuit originates in the collapse of Western States Thrift and Loan (WST), an industrial loan company organized pursuant

to Utah statutes, Utah Code Ann. §§ 7–8–1 *et seq.* Appellant Green filed a complaint setting forth three causes of action. The complaint alleged appellant was the holder of certain WST thrift certificate pass-books ($40,401.69), WST debenture bonds ($10,222.68), and a WST thrift certificate ($2,151.93). It was alleged these thrift certificates, bonds, and pass-book certificates were *securities* within the meaning and intent of 15 U.S.C. § 78c(a)(10) of the Securities Exchange Act. Appellant set forth not only an individual claim but also alleged she was the representative of a class of persons composed of all holders of interests in said WST securities. Defendants named were the aforementioned appellees and persons who had served as officers and directors of WST. Previous to the filing of the complaint, WST had been placed in the hands of the Commissioner of Financial Institutions.

The first cause of action alleged that defendants had violated 15 U.S.C. § 78j[1] and Rule 10b–5[2] in the following manner:

(a) By causing, and in the case of the State of Utah and Brimhall, permitting WST to be operated in an insolvent condition at all times commencing some time prior to January 1, 1966, and by failing to inform plaintiff and the members of the class of WST's insolvent condition.

(b) By causing or permitting WST to make loans to individuals and corporations aggregating more than 10% of the paid up capital and surplus of WST, such loans being in violation of the laws of the State of Utah and in violation of the fiduciary duties owed to plaintiff and the members of the class.

(c) By utilizing, directly or indirectly, and in the case of Brimhall and the State of Utah, permitting the utilization of funds solicited from plaintiff and the members of the class, for the benefit of the officers and directors of WST in violation of Utah Code Annotated section 7–8–5(3), and in violation of the fiduciary duties owed to plaintiff and the members of the class.

(d) By causing or permitting WST to make loans and other advances to individuals and companies after October, 1971, when it was apparent that WST was suffering a capital impairment and was, in fact, insolvent.

(e) By engaging in the false and deceptive practice of constructively crediting the accounts of WST with an amount of money represented by notes payable which were outstanding and maturing in more than one year, in an amount equal to one third of the paid-in capital of WST. . . .

Said constructive credit allowed for computation of capital impairment is contrary to Utah law and not in accordance with generally accepted accounting standards.

The State of Utah and Brimhall were alleged to have violated the securities laws in the following additional ways:

(a) By failing to suspend WST from engaging in the business of selling thrift

---

1. 15 U.S.C. § 78j provides in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

  . . . . .

(b) To use or employ, in connection with the purchase or sale of any security . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . . .

2. 17 C.F.R. § 240.10b–5 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instru-

mentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

certificates and debenture bonds when WST was suffering a capital impairment and was, in fact, insolvent.

(b) By failing to detect through routine examination and verification that WST had made loans to corporations and companies in which the officers and directors of WST had a financial interest.

(c) By failing to notify the investing public and the plaintiff in particular of the substantial operating losses suffered by WST and the precarious financial condition of WST.

(d) By allowing WST to make substantial loans and advances after the Notice of Capital Impairment was issued in March, 1972, and when WST was under a capital impairment and insolvent.

(e) By instituting and maintaining an unauthorized and unlawful constructive credit to the capital accounts of WST which allowed it to make loans and advances in excess of its capability and to the great risk of depositors and security holders.

The second cause of action principally alleged a breach of fiduciary duty and gross negligence by the defendant directors and/or officers. The third cause of action alleged applicability of the Investment Company Act of 1940 (15 U.S.C. § 80a–1 *et seq.*) and claimed violations of that Act by defendants (alleged to be controlling persons).

In response to the complaint, motions to dismiss were filed on behalf of WST and the State of Utah and the Commissioner. In the motion filed on behalf of the State and the Commissioner, the defense of lack of jurisdiction pursuant to the Eleventh Amendment was presented. A memorandum was submitted on the immunity to suit in federal court question, and a hearing on that matter was held. At the conclusion of that hearing, the trial court determined that the Eleventh Amendment had not been waived by Utah; as WST was in state receivership, appellant's counsel agreed the action as to WST should be dismissed. A written order dismissing the action as to Utah, the Commissioner, and WST was entered; subsequently, the trial court dismissed the class action. Pursuant to Rule 54(b), the court's previous orders [3] were confirmed and this appeal followed.

On appeal, the issues are (1) did the State of Utah waive its Eleventh Amendment immunity and (2) did the trial court properly dismiss the class action? Initially, we consider the Eleventh Amendment issue. We assume *arguendo* that the WST thrift certificate pass-books, debenture bonds, and thrift certificates were securities within 15 U.S.C. § 78c(a)(10).

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

This Amendment is not literally applicable to the present case because the suit is brought against the state by one of its own citizens. However, the Supreme Court

---

**3.** The chronology of court orders is as follows:

(a) January 3, 1975. The court approved the settlement agreement between appellant and defendant Kenith E. Lott. The action was dismissed with prejudice as to Lott. The court said it appeared the settlement was in the best interests of the class.

(b) January 7, 1975. The State of Utah, the Commissioner, and WST were dismissed with prejudice.

(c) January 27, 1975. The court orally ordered that the appellant's claim "that Maxine Green is appearing for and on behalf of all other persons similarly situated" be stricken.

(d) April 10, 1975. The court approved the settlement agreement between appellant and defendants Edward McKay, Hollis Hullinger, and Morgan Merkley. The action was dismissed with prejudice as to those defendants.

(e) April 10, 1975. Based upon the stipulation of counsel, the court awarded appellant a judgment against defendant Blair Lund in the sum of $43,529.51 with interest.

It should be noted that on May 12, 1975, appellant's attorney and the attorneys for the defendants stipulated and agreed "that all of the actions against the defendants in this case have heretofore been dismissed and/or judgment rendered. . . ." The confirmation order pursuant to Rule 54(b) was then entered by the court.

". . . has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and cases cited therein.

Our issue does not involve the applicability of this bar to the type of relief sought, an issue discussed in *Edelman, supra*. Also there is no dispute concerning the possibility that the immunity bar can be waived or, in other words, that the state can consent to be sued in federal court. This case does not, however, present any question concerning explicit consent. What is at issue here is whether there has been an implicit waiver of Eleventh Amendment immunity by the State of Utah.

Appellant argues that the state participation in activities regulated by federal securities law does constitute a waiver of immunity. Prime reliance is placed upon *Forman v. Community Services, Inc.*, 500 F.2d 1246 (2d Cir. 1974), *rev'd*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (the Supreme Court did not decide the matter discussed in the Second Circuit's opinion which is relevant to this case). Appellant also points to certain sections of the securities laws; one section, 15 U.S.C. § 77b(2) defines *person* for purposes of the Act as including ". . . a government or political subdivision thereof." Legislative history relevant to the inclusion of states within this definition is also cited. Appellant says the statutes and the legislative history support a determination that Congress intended to regulate states via the securities laws. Certain factual contentions, amplified later, are also made which allegedly indicate a waiver.

Finally, appellant shifts to the cause of action under the Investment Company Act and argues a waiver can be found by analysis of that Act, its policies and history. To resolve this issue of waiver, we initially turn to three Supreme Court cases which most clearly relate to the problem.[4]

The door of waiver of the state's immunity to suit in federal court was opened widest by the first of this trilogy, *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Since 1927, the State of Alabama had been operating the Terminal Railway; the Federal Employers' Liability Act (FELA) had been enacted approximately twenty years previous to Alabama's entry into the railroad business. The FELA provided that "[e]very common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . ." The suit was instituted by persons who sought damages under FELA for personal injuries sustained while employed by the state's railroad. Alabama carried the day in the district and circuit courts relying on sovereign immunity as a defense. The Supreme Court rejected state immunity by saying:

We think that Congress, in making the FELA applicable to "every" common carrier by railroad in interstate commerce, meant what it said. That congressional statutes regulating railroads in interstate commerce apply to such railroads whether they are state owned or privately owned is hardly a novel proposition

. . . .

4. This trilogy of cases constitutes the main guidance by the Supreme Court to us in resolving this problem. Since briefing and argument, the Supreme Court has decided another case involving the Eleventh Amendment and waiver, *Fitzpatrick v. Bitzer*, —— U.S ——, 96 S.Ct. 2666, 49 L.Ed.2d —— (1976). The opinion begins by stating:

In the 1972 Amendments to Title VII of the Civil Rights Act of 1964, Congress, acting under § 5 of the Fourteenth Amendment, authorized federal courts to award money damages in favor of a private individual against a state government found to have subjected that person to employment discrimination on the basis of "race, color, religion, sex, or national origin."

The Eleventh Amendment did not bar a suit for backpay. We believe the intent to abrogate the immunity conferred by the Eleventh Amendment is much clearer in the statutes relied upon in *Fitzpatrick* than in our present case. *Fitzpatrick* merely applies the principles set forth in the trilogy of cases.

. . . To read a "sovereign immunity exception" into the Act would result, moreover, in a right without a remedy; it would mean that Congress made "every" interstate railroad liable in damages to injured employees but left one class of such employees—those whose employers happen to be state owned—without any effective means of enforcing that liability.

.    .    .    .    .

. . . It remains the law that a State may not be sued by an individual without its consent. Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act. By adopting and ratifying the Commerce Clause, the States empowered Congress to create such a right of action against interstate railroads; by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit.

Following *Parden*, concern about the real viability of the state immunity defense was laid to rest by the Supreme Court in *Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). Here certain employees of the Missouri Department of Health and Welfare sued that Missouri department and the State of Missouri seeking to recover overtime compensation due them under § 16(b) of the Fair Labor Standards Act (FLSA). The Court allowed the defense of immunity. Justice Douglas noted that in 1966 the FLSA had been amended to include "employees of a State, or a political subdivision thereof, employed (1) in a hospital, institution, or school" of certain types. Via this amendment, "Missouri and the departments joined as defendants [were] con-

stitutionally covered by the Act . . . ." However, the question remained "whether Congress has brought the States to heel, in the sense of lifting their immunity from suit in a federal court . . . ."

The Court said it could not find a word in the history of the 1966 amendments which indicated Congress desired to allow "a citizen of that State or another State to sue the State in the federal courts." Moreover, the Court said, "It is not easy to infer that Congress in legislating pursuant to the Commerce Clause, which has grown to vast proportions in its applications, desired silently to deprive the States of an immunity they have long enjoyed under another part of the Constitution."

*Parden* was distinguished by the Court as follows:

*Parden* involved the railroad business which Alabama operated "for profit." . . . *Parden* was in the area where private persons and corporations normally ran the enterprise.

.    .    .    .    .

. . . The dramatic circumstances of the *Parden* case, which involved a rather isolated state activity, can be put to one side.

.    .    .    .    .

. . . It is true that, as the Court said in *Parden*, "the States surrendered a portion of their sovereignty when the granted Congress the power to regulate commerce." . . . But we decline to extend *Parden* to cover every exercise by Congress of its commerce power, where the purpose of Congress to give force to the Supremacy Clause by lifting the sovereignty of the States and putting the States on the same footing as other employers is not clear.

The prerequisites for waiver were amplified in the recent case of *Edelman v. Jordan, supra*. There an Illinois resident sought individual and class action relief against certain state officers for alleged violations in the administration of the Aid to the Aged, Blind and Disabled (AABD) program. The Supreme Court allowed in-

junctive relief and in dealing with the requested award for retroactive benefits once again faced the waiver of immunity issue.

The Court noted that in *Parden* and *Employees* the Congress had authorized suits against a general class of persons which literally included states. Thus, the Court had determined the waiver or consent issue depending on " . . . whether Congress had intended to abrogate the immunity in question, and whether the State by its participation in the program authorized by Congress had in effect consented . .." However in *Edelman,* the Court believed " . . . the threshold fact of congressional authorization to sue a class of defendants which literally includes States [was] wholly absent." A provision of the Social Security Act which provided that future allocations of federal monies would be terminated if a State did not comply with federal distribution requirements was not sufficient to constitute a waiver by a participating State of Eleventh Amendment immunity. The Court also noted the following:

> And while this Court has, in cases such as *J. I. Case Co. v. Borak,* 377 U.S. 426 [84 S.Ct. 1555, 12 L.Ed.2d 423] (1964), authorized suits by one private party against another in order to effectuate a statutory purpose, it has never done so in the context of the Eleventh Amendment and a state defendant.

The trilogy of cases has been applied to fact situations similar to our own. In *Brown v. Commonwealth of Kentucky,* 513 F.2d 333 (6 Cir. 1975), *cert. den'd,* 423 U.S. 839, 96 S.Ct. 70, 46 L.Ed.2d 59, the Sixth Circuit held that the Eleventh Amendment protected the Commonwealth from suit by one of its citizens for damages resulting from alleged federal securities law violations. The suit was brought by the receiver of a building and loan association; damages were sought for allegedly "fraudulent or grossly negligent failure of the Commissioner of Banking and Securities and certain named loan examiners employed by that department to discover the mismanagement and unlawful self-dealings of the president and certain officers of the Association over a four year period." The plaintiff-appellant argued, relying on *Parden,* that Congress in 1933 and 1934 had enacted a comprehensive scheme of securities regulation with exclusive jurisdiction in the federal courts to hear actions under these laws and the Commonwealth by interposing itself in the affairs of the building and loan association had waived its immunity to suit.

The Sixth Circuit denied this claim and said:

> Our examination of both the Securities Act of 1933 and the Securities Exchange Act of 1934 totally fails to reveal "a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts." *Employees v. Missouri Public Health Dept.,* . . .. Here the statutory duty imposed upon the Kentucky Commissioner of Banking and Securities cannot in any way be construed as the exercise of a proprietary function, but is rather clearly the exercise of a regulatory function of the state over its own chartered institutions which has been historically exercised as part of its governmental powers. There is nothing to suggest that either federal act was intended to be or should be construed either to divest the Commonwealth of Kentucky of the power to regulate its state chartered institutions or beyond that, to do so only upon condition of its consent to be sued by one of its own citizens if that power is for any reason improperly exercised.

The Sixth Circuit in *Yeomans v. Commonwealth of Kentucky,* 514 F.2d 993 (1975), *cert. den'd,* 423 U.S. 983, 96 S.Ct. 404, 46 L.Ed.2d 309 (Brennan, J., dissenting), applied the *Brown* rationale in a case where the plaintiffs charged that the "defendant States went beyond the regulatory functions and became aiders and abettors or participants in fraudulent activities which resulted in widespread losses to the investors and which exposed other persons to suit by the investors . . .." The *Yeomans* court cited the above quoted language from *Brown* and said, "Plaintiffs argue that

entry by a state, in its regulatory capacity, into the congressionally regulated area of securities constitutes just such an implied waiver of immunity. This court has specifically rejected that argument." The Sixth Circuit rejected the attempt to distinguish *Brown* because of the allegation that the States (Ohio and Kentucky) had failed to properly regulate as required by their own statutes. "Regardless of what the specific allegations may be, the complained of activities of the defendant States arose out of the immunity clothed function of governmental regulation of securities."

These cases would end our inquiry except that appellant presents us with the case of *Forman v. Community Services, Inc., supra.* The primary question in *Forman* was whether shares of stock in a nonprofit cooperative apartment company chartered and subsidized by New York were securities. The Second Circuit held they were, and the Supreme Court disagreed and reversed. In that case the state interposed the defense of sovereign immunity. The Supreme Court did not reach that matter. The Second Circuit, however, held that the state itself had waived sovereign immunity. First an express waiver was cited, and second the court found an implied waiver of sovereign immunity.

> [T]he State has waived its sovereign immunity with respect to federal securities laws violations by voluntarily entering a field under federal regulation. *See Parden v. Terminal Railway of Alabama Docks Department*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Thus when the State enacted the Mitchell-Lama Act in 1955 and codified it in 1961, it did so with the knowledge that transactions involving subscriptions for stock solicited through the mails were already within the ambit of federal anti-fraud regulations and statutes. To paraphrase the court's opinion in *Parden* . . ., by enacting the federal securities laws in the exercise of the Commerce Clause—a power given to the federal government by the states in adopting and ratifying the constitution—the Congress conditioned the right to be involved in the sale and

distribution of securities upon amenability to suit in federal court as provided by those regulatory laws. Were there any doubt that the securities laws were intended to reach states or their agencies, the legislative history dispels it. *See* H.R.Rep. No. 85, 73d Cong., 1st Sess. 11.

We believe close analysis reveals significant factual differences between *Forman* and the *Brown* and *Yeomans* cases which explain to some extent the contradictory results and language. *Forman* did indeed present a situation closer to *Parden.* The State of New York was not merely involved in a regulatory capacity; the district court specified New York's involvement in that project as follows:

> [T]he defendant New York State Housing Finance Agency . . . provided the bulk of the financing for the project through long-term, low-interest mortgage loans; and the defendant New York State Division of Housing and Community Renewal . . . is responsible for the supervision of the development, construction, promotion and operation of the project.

*Forman v. Community Services, Inc.*, 366 F.Supp. 1117 (S.D.N.Y.1973), *rev'd,* 500 F.2d 1246 (2d Cir. 1974), *rev'd,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Consequently, the facts of *Brown* and *Yeomans* are closer to those in our case. Utah was not involved in the actual selling and distribution of securities except to the extent its laws allowed industrial loan banks to issue securities. Rather, Utah was engaged in a regulatory function as were the states of Kentucky and Ohio in the Sixth Circuit cases.

To the extent the dicta of *Forman* concerning the implication of a broad waiver of immunity resulting from the securities laws differs from the decisions of *Brown* and *Yeomans,* we follow the reasoning and determination of the Sixth Circuit. The fact that one statute in the Securities Act, 15 U.S.C. § 77b(2) defines *person* to include "a government or political subdivision thereof" does not present the type of indi-

cation needed to establish a congressional intent to lift Eleventh Amendment immunity. We do not discern an intent to bring the states to heel. *Employees, supra.* None of the three Supreme Court cases deals with a factual situation involving a state's pursuit of so clearly a governmental function as regulation of its own state-chartered commercial institutions. We believe, however, the rationale applied in *Employees* is applicable here. There the Court sought an indication that Congress desired to lift the state's immunity and indicated clear language was needed to effect that result. Our search of the applicable securities laws has not disclosed an intention on Congress' part to remove the state's immunity when it engages in regulating state chartered agencies or to condition Utah's operation of that function upon consent to suit in a federal forum when securities are involved in that regulatory function. The absence of that congressional intent resolves the Eleventh Amendment question at an early stage and prevents inquiry into conduct by the state which might constitute consent.

Appellant contends *Brown* and *Yeomans* are distinguishable because here the Commissioner was involved directly in the affairs of the corporation which went beyond mere government regulation and included intentional deception. Our review of the complaint does not permit a construction which would go beyond activities alleged in *Brown* and *Yeomans* or of a very similar nature. "[R]egardless of what the specific allegations may be, the complained of activities of the defendant . . . arose out of the immunity clothed function of governmental regulation of securities," *Yeomans, supra* [here the regulation was of institution issuing items we have assumed were securities].

■ One other point concerning waiver under the securities laws should be mentioned. Appellant argues the immunity de-

fense will in effect deny a forum to prosecute this cause of action against the state. *See* 15 U.S.C. § 78j. This argument cannot be altogether minimized, but it alone does not constitute a sufficient basis to determine that Congress intended to deprive the state of its historic immunity. As one court said, "The apparent hardships resulting from the adoption and retention of the doctrine's intended operation . . . have long been subordinated." *MacKethan v. Commonwealth of Virginia,* 370 F.Supp. 1 (E.D.Va.1974), *aff'd,* 508 F.2d 838, *cert. den'd,* 422 U.S. 1045, 95 S.Ct. 2661, 45 L.Ed.2d 697 (1975). Particularly this subordination of hardship seems acceptable when a governmental function is involved. Other arguments are made by appellant [5] but our determination of the absence of an intent by Congress to lift this immunity precludes the necessity of their consideration.

■ Appellant's reliance upon the Investment Company Act presents exactly the same problems as mentioned under the securities laws. We have been cited to no provision and we have located no provision which lifts the immunity of states to suit in federal court for regulating their own chartered institutions which might be covered by this same Act. We intimate no opinion concerning the applicability of the Act or any of its numerous exemptions because appellant fails on the threshold of the immunity doctrine.

Appellant contends the class action was improperly dismissed. We do not, however, reach the merits of that argument. The action is ended as all defendants are out of the litigation. The only dismissal attacked by appellant was the dismissal involving the State of Utah, the Commissioner, and WST. The sole ground for attacking that dismissal has been decided adversely to appellant. Consequently, no one is left in this action to sue.

AFFIRMED.

---

**5.** Appellant briefly posits the contention that via the Fourteenth Amendment's prohibition of a state's taking property without due process of law the Eleventh Amendment immunity of Utah has been eliminated in this case. Suffice it to say, the cases where such a superseding

rationale has been applied are distinguishable from the instant matter. *Cf. Lemelson v. Ampex Corp.,* 372 F.Supp. 708 (N.D.Ill.1974); *Hercules, Inc. v. Minnesota State Highway Dept.,* 337 F.Supp. 795 (D.Minn.1972).